[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 154 
This is a medical malpractice/wrongful death case. Dr. Thomas C. Looney appeals from a judgment entered on a jury verdict in favor of the plaintiff, Willie Davis, Jr., the husband of Eva Winn Davis and administrator of her estate. We reverse and remand.
 I. Facts
The evidence, viewed in the light most favorable to the plaintiff, St. Clair Federal Savings Bank v. Rozelle,653 So.2d 986 (Ala. 1995), shows the following: On the morning of July 6, 1989, Eva Winn Davis, then age 60, visited Dr. Looney's dentistry office in Livingston, Alabama, complaining of severe pain in her first upper right molar. Dr. Looney had treated Mrs. Davis before but, because he had not seen her for many years, he instructed her to fill out a patient questionnaire. On this form, Mrs. Davis answered affirmatively to a question asking whether she had been hospitalized in the past two years, and she also circled the words "bleeding, pain" in a question asking whether she had any problems with her gums. She left blank a section that listed various maladies, including "anemia," "hepatitis," "jaundice," and "liver disorder," and requested patients to circle any that applied. Responding to her questionnaire, Dr. Looney inquired about the reason for her hospitalization, and Mrs. Davis replied vaguely that she had gone into the hospital about six months before for some tests but that she was "okay." He questioned her about the pain and bleeding in her gums, and she stated that she did not know why she wrote "bleeding" but that she was referring to the tooth pain that prompted her visit to his office. Dr. Looney then asked her if when she cut herself in the kitchen she bled for a long time. She answered "no." Concluding that Mrs. Davis did not pose a significant risk of bleeding problems, Dr. Looney extracted her tooth.
However, despite what she had told Dr. Looney, the hospitalization to which Mrs. Davis referred on her questionnaire had revealed several potentially serious health problems. On January 14, 1989, Mrs. Davis, suffering from pneumonia, had been admitted to Hill Hospital of York (Hill Hospital) in York, Alabama. During her six-day stay, Mrs. Davis's attending physician was Charles Quarles, M.D. Mrs. Davis underwent a series of tests, which disclosed that, besides pneumonia, she was also suffering from alcohol-induced *Page 155 
cirrhosis of the liver, anemia, jaundice, a low platelet count in her blood, and hepatitis. These disorders suggested that Mrs. Davis might have problems with her blood not clotting properly.
Throughout the day and evening after her tooth extraction, Mrs. Davis continued to experience bleeding from the site. When the bleeding persisted the following morning, Friday, July 7, Mrs. Davis returned to Dr. Looney's office. He placed on the site a small amount of "surgicel," a substance that acts as a hemostatic agent, and put a suture over it to keep it in place because the plasma was expelling it. Dr. Looney also prescribed penicillin for what he believed was a mild post-operative infection. However, Mr. Davis saw his wife soon after she had left Dr. Looney's office that Friday morning, and she showed him that her mouth was still bleeding. At home that evening, Mr. Davis noticed that his wife was spitting some blood into a cup.
The next day, Saturday, July 8, Mrs. Davis remained at home, watching television and playing with her grandchild. She continued to spit blood into the cup. After Mrs. Davis went to bed for the evening, family members found her passed out and on blood-stained bedsheets. Mrs. Davis's daughters, Mary and Cora, and Cora's husband, Benjamin, drove Mrs. Davis to Bryan W. Whitfield Memorial Hospital (Bryan Whitfield) in Demopolis, where she was admitted to the emergency room at 11:38 p.m. Mrs. Davis's daughter Mary told the nurse there that Mrs. Davis had been bleeding for two or three days since she had had her tooth extracted. The nurse placed gauze in Mrs. Davis's mouth and had her bite down. Dr. Paul Ketcham, Mrs. Davis's attending physician in the Bryan Whitfield emergency room, then briefly examined her. He shined a light in her mouth and, noting some blood oozing under the gauze near the suture, told her to see her dentist and then walked out of the examination room. Unsatisfied with what they perceived to be inadequate medical treatment, the family members who had accompanied Mrs. Davis to the emergency room followed Dr. Ketcham into the hall, where Mary angrily inquired whether he was going to let Mrs. Davis bleed to death. Dr. Ketcham did not respond and continued to walk away.
Still upset, Mary went to the waiting room and called her sister Betty from a pay telephone, asking that Betty telephone Dr. Looney at his home. Betty complied, telephoning Dr. Looney's residence at approximately 12:30 a.m. on Sunday, July 9. Dr. Looney's wife answered; Betty told her that Mrs. Davis was at Bryan Whitfield Hospital and that the person in charge would not administer treatment and asked that Dr. Looney telephone in treatment orders. Dr. Looney instructed his wife to tell the caller that he was not on staff at Bryan Whitfield and therefore could not call in orders, but that if there were any problems the emergency room doctor on call should telephone him. The nurse in the Bryan Whitfield emergency room likewise told the Davis family that she could not take treatment orders from Dr. Looney because he was not on staff. In any event, Dr. Looney did not receive a call from Dr. Ketcham, and no further treatment was administered at Bryan Whitfield. Mrs. Davis was released at 12:30 a.m. with instructions to keep pressure on the area and to return to her dentist. Mrs. Davis's two daughters and her son-in-law drove her back to her home.
Sometime before 3:00 a.m., Mr. Davis was awakened by his daughter Dora, who told him, "Mama is bleeding to death." He instructed Dora to telephone the paramedics and Dr. Looney. An ambulance arrived; the emergency medical technician telephoned Dr. Looney and told him that Mrs. Davis was weakened, confused, fainting, and lethargic. Dr. Looney instructed the technician to take her to Druid City Hospital in Tuscaloosa. However, the technician replied that the ambulance service had to take Mrs. Davis first to the closest hospital, which was Hill Hospital in York. The ambulance service took Mrs. Davis to Hill Hospital, where she was admitted to the emergency room at 3:05 a.m. on Sunday, July 9. Mrs. Davis's attending physician in the Hill Hospital emergency room was Dr. Charles Quarles, the same doctor who had diagnosed her liver disease when she was at the same facility with pneumonia in January 1989, about six months earlier. *Page 156 
Dr. Quarles recognized that Mrs. Davis was "actively bleeding" from the extraction site and also that she was jaundiced. Dr. Quarles recalled that Mrs. Davis's January hospitalization had revealed she suffered from liver disease, so he ordered a hepatitis and liver profile and gave her a shot of penicillin. His prescribed treatment for the bleeding was for Mrs. Davis to apply pressure to the site, using gauze, and to bite down on tea bags, which contain tannic acid, a chemical that assists in clotting. Although she was still bleeding to some degree, Mrs. Davis was released from the emergency room at 7:40 a.m. with instructions to "See Dr. Looney Monday." Mrs. Davis spent the remainder of that Sunday at home. She was alert and oriented, but weakened and still using a cup to spit blood in.
The following morning, Monday, July 10, 1989, Mr. Davis awoke to find his wife semiconscious, unable to speak, and "fighting her hands and things." Mrs. Davis was once again taken by ambulance to the Hill Hospital emergency room, where she was admitted at 7:15 a.m. The emergency room nurse noted on Mrs. Davis's record that she was weak and lethargic, that the bleeding had continued since the tooth was extracted, and that she had been bleeding from her mouth all night. Recognizing that Mrs. Davis was now in critical condition, the doctor on call, Dr. Eleanor Eller, immediately ordered emergency transfusions and prepared her to be transferred to Rush Memorial Hospital in Meridian, Mississippi. Dr. Eller noted on the emergency transfer certificate, "large amounts of blood loss from bleeding gum, patient in borderline shock on arrival, blood transfusion begun fifteen minutes before transfer." At 10:40 a.m., Mrs. Davis arrived at Rush Memorial, where she was diagnosed with gram negative sepsis, a generalized infection of e. coli bacteria. It was noted that Mrs. Davis suffered from coagulopathy, which is an inability of her blood to clot, due to sepsis, liver disease, and anemia. Mrs. Davis did not respond to treatment and was pronounced dead at 11:55 p.m. on July 10, 1989.
On May 7, 1990, Mr. Davis, as administrator of his wife's estate, filed a medical malpractice action against Dr. Looney, Dr. Quarles, Hill Hospital, the City of York, Bryan Whitfield Hospital, [1] and the City of Demopolis. Mr. Davis alleged that these defendants had provided substandard medical care to his wife and that their combined and concurring negligence had resulted in her death. The trial court granted a motion to dismiss filed on behalf of the City of Demopolis. On September 21, 1990, Dr. Quarles filed a bankruptcy petition and later had the action removed to a federal court. Upon a petition by Mr. Davis, the federal court remanded the case to the state court, with the restriction that any recovery against Dr. Quarles would be limited to the extent of his liability insurance, $1 million. The trial court granted motions for summary judgment on behalf of the City of York and Hill Hospital.
The cause was tried against the remaining defendants: Dr. Looney, Dr. Quarles, and Bryan Whitfield Hospital. The defendants moved for directed verdicts at the close of the plaintiff's case and renewed those motions at the close of all the evidence. The court denied those motions. On March 29, 1996, the jury returned a verdict against all three defendants in the amount of $3 million. The trial court entered a judgment on the verdict, but granted a motion to reduce the judgment as to Bryan Whitfield Hospital to $100,000, pursuant to § 11-93-2, Ala. Code 1975. Dr. Looney moved for a judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur. Bryan Whitfield Hospital and Dr. Quarles reachedpro tanto settlements with the plaintiff in the amounts of $100,000 and $900,000, respectively, thereby reducing the outstanding judgment to $2 million. On July 6, 1996, the trial court, after conducting a hearing pursuant to Hammond v.City of Gadsden, 493 So.2d 1374 (Ala. 1986), denied Dr. Looney's posttrial motions. Dr. Looney appeals.
 II. Issues
Dr. Looney raises several issues: (1) whether the trial court erred in denying his *Page 157 
motion for a judgment notwithstanding the verdict, (2) whether the trial court erred in denying his motion for a new trial, based on various alleged errors in the proceedings; and (3) whether the trial court erred by denying his motion for a remittitur, which had argued that the $3 million judgment, reduced by settlements to $2 million, was excessive.
 III. Sufficiency of the Evidence
Dr. Looney first argues that the trial court erred in denying his motion for a directed verdict and later his motion for a judgment notwithstanding the verdict. The standard of review for testing these two motions is identical, as they both challenge the sufficiency of the evidence. J.B. Hunt Transport, Inc.v. Credeur, 681 So.2d 1355 (Ala. 1996). That standard is whether the nonmovant has presented substantial evidence in support of each element of his claim; if he has not, then the motion should be granted. Malcolm v. King,686 So.2d 231 (Ala. 1996). To prove liability in a medical malpractice case, the plaintiff must prove (1) the appropriate standard of care, (2) the doctor's deviation from that standard, and (3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff. Complete Family Care v. Sprinkle,638 So.2d 774 (Ala. 1994); Bradford v. McGee, 534 So.2d 1076
(Ala. 1988); § 6-5-484, Ala. Code 1975. The plaintiff in a medical malpractice action generally must establish the prima facie elements by introducing expert testimony.Bradford, supra. And, as noted previously, in reviewing a trial court's ruling on a motion for directed verdict or JNOV, this Court must view the evidence in a light most favorable to the nonmovant, in this case Mr. Davis. St. Clair FederalSavings Bank v. Rozelle, supra.
The plaintiff presented evidence that Dr. Looney's treatment of Mrs. Davis breached the standard of care in several ways. First, the plaintiff's dental expert, Morris Benveniste, D.D.S., testified that Dr. Looney did not take an appropriate medical history on Mrs. Davis because he failed to properly follow up on her questionnaire responses. Dr. Benveniste stated that the standard of care required Dr. Looney to find out exactly why Mrs. Davis had been recently hospitalized, in order to determine whether extracting her tooth might pose a bleeding problem or other health risk. He explained that even if Mrs. Davis answered Dr. Looney's questions vaguely, it was still Dr. Looney's responsibility to ensure her safety by obtaining the necessary information through asking her more pointed follow-up questions or by contacting the doctor who had treated her. Dr. Benveniste opined that Dr. Looney's inquiry into whether Mrs. Davis bled for a long time when she cut herself in the kitchen was insufficient under the standard of care to determine whether she posed a bleeding risk because it was uncertain how long it had been since she had cut herself. He also stated that taking a proper history became even more important when Mrs. Davis returned to Dr. Looney's office the day after the extraction complaining of continued bleeding.
Second, there was evidence that Dr. Looney breached the standard of care by failing to notice Mrs. Davis's obvious symptoms of jaundice, a condition Dr. Looney acknowledged he was trained to look for as an indicator of liver disease and potential bleeding problems. Jaundice is the buildup in the bloodstream of bilirubin, a bile pigment that causes a yellow discoloration of the skin and the whites of the eyes. Dr. Looney admitted that if Mrs. Davis was manifesting symptoms of jaundice and he failed to recognize them then he would have breached the standard of care. Dr. Looney maintained, however, that Mrs. Davis was not jaundiced upon either visit to his office. But less than 72 hours after Dr. Looney extracted Mrs. Davis's tooth, Dr. Quarles examined her in the Hill Hospital emergency room and noted on her chart that he recognized she was jaundiced. Other evidence further suggested that Mrs. Davis was showing clear signs of jaundice from at least January 1989 until her death. There was testimony that a bilirubin level of up to about 1.2 is considered normal, that the yellow discoloration of the eyes is detectable to a trained professional once the level is much above 2.0, and that "by three or four it would become pretty obvious." Mrs. Davis's bilirubin level was found to be 5.3 when she *Page 158 
was at Hill Hospital in January 1989 and 6.3 when she returned to the emergency room of that same hospital on the day she ultimately died, July 10, 1989. Dr. Benveniste testified that, under the standard of care, if a dentist discovered that his patient had jaundice, that would be a signal of liver disease and potential bleeding complications, and that that situation would require that the dentist, before extracting a tooth, refer the patient to a physician qualified to assess the patient's medical condition and to take any precautions deemed medically necessary to safeguard against potential bleeding problems.
The plaintiff also presented evidence that Dr. Looney breached the standard of care by failing to remove granulated tissue around the extraction site and also by the manner in which he used the "surgicel." Dr. Benveniste testified that granulated tissue is tissue that is still alive but, because of infection, is very soft and has a tendency to bleed, and that the standard of care requires its removal. Dr. Looney did not remove it. Dr. Benveniste also indicated that Dr. Looney's use of the surgicel violated the standard of care because it violated the manufacturer's instructions.
Finally, the plaintiff contended that Dr. Looney breached the standard of care by failing to render aid to Mrs. Davis on July 9 once he learned at 12:30 a.m. that she was at Bryan Whitfield Hospital and again when he learned at 3 a.m. that she was being taken by ambulance to Hill Hospital. Dr. Benveniste testified to the effect that Mrs. Davis's continued bleeding on July 9 might have been at least partially a "medical problem," which would have required treatment by a physician, but that it also might have been partially a "dental problem," which Dr. Looney would have been qualified to treat. He further stated that, as the primary caregiver, Dr. Looney had an obligation to "follow through and make sure [Mrs. Davis] got proper care."
Indeed, it appears that Dr. Looney does not dispute that there was sufficient evidence for the jury to find that he breached the standard of care. Rather, the focus of Dr. Looney's argument is that there is not substantial evidence establishing that any breach of care by him proximately caused Mrs. Davis's death. He emphasizes that at no time did Dr. Benveniste, the plaintiff's dental expert, offer testimony linking any violation of the standard of care by Dr. Looney to the cause of Mrs. Davis's death.
"The rule in Alabama in medical malpractice cases is that to find liability, there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury. There must be evidence that the negligence probably caused the injury. Pappa v. Bonner,268 Ala. 185, 105 So.2d 87 (1958)." Baker v. Chastain,389 So.2d 932, 934 (Ala. 1980). Accord McAfee v. Baptist MedicalCenter, 641 So.2d 265 (Ala. 1994); Parrish v.Russell, 569 So.2d 328 (Ala. 1990). Because the plaintiff alleged that negligent health care by all three defendants combined to cause Mrs. Davis's death, we note that a particular defendant's negligence need not be the sole cause of injury in order for an action to lie against that defendant; it is sufficient that the negligence concurred with other causes to produce injury. Buchanan v. Merger Enterprises, Inc.,463 So.2d 121 (Ala. 1984). However, it is still necessary that the plaintiff prove that the defendant's negligence proximately caused the injury. Martin v. Arnold, 643 So.2d 564
(Ala. 1994).
The evidence in this case was sufficient for the jury to find that Dr. Looney breached the standard of care in extracting Mrs. Davis's tooth without first taking a sufficiently thorough history and physical examination of his patient and that that breach was a proximate cause of her death. As previously explained, the evidence indicated that Dr. Looney breached the standard of care by conducting an inadequate inquiry into Mrs. Davis's prior hospitalization and by overlooking obvious indications that she was jaundiced. Consequently, Dr. Looney extracted Mrs. Davis's tooth without discovering that she was suffering from a serious liver condition, which Dr. Looney conceded is associated with an inability of the blood to clot properly. And despite the fact that Mrs. Davis returned the following morning complaining of continued bleeding, Dr. Looney *Page 159 
still failed to discern her liver disease or that she posed a bleeding risk.
Dr. Looney's argument that the plaintiff's dental expert failed to provide sufficient evidence proximately linking an act or omission of Dr. Looney to Mrs. Davis's death is illusory; as a dental expert, Dr. Benveniste could testify as to breaches of the dental standard of care, but he is not qualified to give a medical opinion on the cause of death. However, the plaintiff's two physician witnesses, Dr. Kevin Ferentz and Dr. William Huffman, testified that Mrs. Davis's death was caused by continued blood loss over the course of several days from the tooth extraction site, which blood loss led directly to shock and a lethal generalized e. coli sepsis infection. These experts also testified that, in their opinion, the cause of Mrs. Davis's continued bleeding was her underlying liver disease. Dr. Looney admitted that had he known of Mrs. Davis's liver condition, he would not have extracted the tooth without first consulting a physician, and Dr. Quarles testified that, had he been contacted, before consenting to the extraction he would have required certain liver and blood tests in order to assess the potential bleeding risks. Dr. Ferentz and Dr. Huffman testified that they believed such tests would have revealed that Mrs. Davis's blood was not able to clot properly. Thus, we conclude that the evidence was sufficient to allow the jury to find that Dr. Looney's extraction of Mrs. Davis's tooth precipitated the bleeding, which, as a result of the liver disease that he, in violation of the standard of care, failed to detect or safeguard against, continued for several days until she ultimately died from associated complications.
Dr. Looney argues, however, that negligence on the part of Dr. Ketcham and Dr. Quarles, the emergency room doctors who treated Mrs. Davis after Dr. Looney had extracted her tooth, was a superseding intervening cause of Mrs. Davis's death. In a related argument, Dr. Looney contends that proximate cause was not established because, he argues, it was simply unforeseeable that Mrs. Davis would die as the result of an improper tooth extraction. He emphasizes that the plaintiff's experts agreed that Mrs. Davis would not have lost so much blood but for her underlying liver disease and that all the witnesses questioned on the subject acknowledged that they had never before heard of a patient dying from blood loss following the removal of a tooth.
"In Alabama, the issue of proximate causation hinges on foreseeability and is intertwined, analytically, with the concept of intervening cause." Springer v. JeffersonCounty, 595 So.2d 1381, 1384 (Ala. 1992). Indeed, this Court has stated:
 "[F]oreseeability is the cornerstone of proximate cause, Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). As a result, one is held legally responsible for all consequences which a prudent and experienced person, fully acquainted with all the circumstances, at the time of his negligent act, would have thought reasonably possible to follow that act, Prescott v. Martin, 331 So.2d 240
(Ala. 1976), including the negligence of others, Williams v. Woodman, 424 So.2d 611
(Ala. 1982)."
General Motors Corp. v. Edwards, 482 So.2d 1176, 1194
(Ala. 1985). This Court has further explained,
 "It is an accepted principle that a defendant is liable for all the foreseeable injuries caused by his negligence. Williams [v. Woodman, 424 So.2d 611 (Ala. 1982)]; McClendon v. City of Boaz, 395 So.2d 21
(Ala. 1981); O'Quinn v. Alston, 213 Ala. 346, 104 So. 653 (1925). That an injured party will receive negligent medical care is always foreseeable. This Court has accepted this presumption, holding:
 "`[W]here one is injured by the negligent or wrongful act of another, and uses ordinary care in endeavoring to be healed, and in the selection of medical and surgical help, but his injury is aggravated by the negligence or unskillfulness of the latter, the party causing the original injury will be responsible for the resulting damages to its full extent.'
 "Williams v. Woodman, supra, at 613, citing O'Quinn v. Alston, supra."
Ex parte Rudolph, 515 So.2d 704, 707-08 (Ala. 1987) (emphasis in original). *Page 160 
The jury found that both Dr. Ketcham and Dr. Quarles had provided substandard medical care that combined with the prior negligence of Dr. Looney to proximately cause the death of Mrs. Davis. Dr. Looney urges, however, that we should find that proximate cause was lacking because, he argues, the responsibility to prevent harm had shifted from him to the emergency room doctors and that he was thus relieved of any liability. In support of his position, Dr. Looney directs our attention to Restatement (Second) of Torts § 452 (1965). That section reads as follows:
 "Third Person's Failure to Prevent Harm "(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.
 "(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause."
This Court has never considered this Restatement
section. Our analysis of it begins with a discussion of the Comments. Comment (a) states the general situation to which § 452 as a whole is directed, i.e., the situation where an original negligent actor has created an unreasonable risk of harm to another and a third party is in a position to prevent that harm by taking some sort of affirmative action. Comments (b) and (c) state that subsection (1) sets out the general rule that the subsequent act of a third person or the omission of a third person to prevent the harm to another threatened by the original actor's negligent conduct is not a superseding cause of such harm. See, e.g., Williams v. Woodman, supra (holding it generally no defense that negligence of third persons contributed to cause injury, if the original negligence of the defendant was a proximate cause). The comments further explain that, under this general rule, if the third person is under a duty to the other to take action to prevent the harm, his failure to do so will subject him to liability for his own negligence, which is concurrent with that of the original actor, whose liability remains fully intact. See, e.g., Davison v.Mobile Infirmary, 456 So.2d 14 (Ala. 1984).
Comments (d), (e), and (f) explain the "exceptional" situations in which subsection (2) might be applied to relieve the original actor from all responsibility for any resulting harm. These situations arise where the entire duty for the situation has been shifted from the original actor to a third person. "The shifted responsibility means in effect that the duty, or obligation, of the original actor in the matter has terminated, and has been replaced by that of the third person." Comment (d), § 452 Restatement (Second) of Torts. Comment (e) explains that one way the responsibility may be shifted is by agreement, either "[b]y contract, by gratuitous promise, or by fair implication from what is agreed." Comment (f) states that a court may find responsibility has shifted from the original actor even in the absence of an agreement, and advises considering such factors as
 "the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relationship to the plaintiff or to the defendant, [and] the lapse of time."
Dr. Looney points to one federal decision, Siggers v.Barlow, 906 F.2d 241 (6th Cir. 1990), as persuasive authority for his position that his case is an exceptional one in which the duty had shifted so that he was absolved of liability. In that case, the plaintiff, Siggers, suffered a severe fracture of his wrist. He was taken to a hospital emergency room, where his treating physician, the defendant, Dr. Barlow, misdiagnosed an X-ray of Siggers's wrist as showing merely a sprain. After Dr. Barlow released Siggers with no further care scheduled, the staff radiologist reviewed Siggers's X-ray and identified the fracture in his wrist. The radiologist made a report of the misdiagnosis, which was then sent to the emergency room. Pursuant to established hospital procedures applicable at the time, the duty to notify a *Page 161 
patient of a misdiagnosed X-ray was placed on the emergency room physician on duty when the report was received in the emergency room. When the report arrived in the emergency room, a few days after Siggers was treated, the physician on call was a Dr. Robertson; that doctor attempted, by telephone, to notify Siggers of the misdiagnosis, but was unsuccessful. Because he was not timely notified of the misdiagnosis and that he needed immediate further medical care, there had been enough healing of the bones that corrective surgery was greatly complicated. Siggers brought a medical malpractice action against Dr. Barlow, but not against Dr. Robertson. After the jury returned a verdict in Siggers's favor, the trial court granted Dr. Barlow's motion for a judgment notwithstanding the verdict, on the ground that, under the principle of § 452(2) ofRestatement (Second) of Torts, the duty to notify Siggers of the misdiagnosis had shifted to Dr. Robertson, so that Dr. Barlow was relieved of liability. 906 F.2d at 242-43.
On appeal, Siggers contended that the trial court had erred because, he argued, his injuries were proximately caused by the concurring negligence of Dr. Barlow and Dr. Robertson. The Court of Appeals for the Sixth Circuit, applying Kentucky law, disagreed, holding that the trial court had properly applied § 452(2) to conclude that Dr. Robertson's failure to notify Siggers was a superseding cause of the injury. The court held that it was Dr. Robertson's failure to notify Siggers that had failed to prevent the harm that occurred by allowing the bones to heal improperly; and it held that, under the hospital's procedures, there was at least an implied agreement to shift to Dr. Robertson the duty to notify Siggers. 906 F.2d at 244-45.
Even if we agreed that Siggers v. Barlow was correctly decided — and we think that point questionable — this present case is distinguishable from it and is governed by the general rule that subsequent negligent medical care is foreseeable and therefore is not regarded as a superseding cause of injury. Williams, supra. This case is more analogous to Fish v. Los Angeles Dodgers Baseball Club,56 Cal.App.3d 620, 128 Cal.Rptr. 807 (1976), which theSiggers court purported to distinguish. InFish, a 14-year-old boy was struck in the head with a foul ball while attending a Los Angeles Dodgers baseball game. The Dodger Stadium emergency care physician examined the boy and determined that he had merely suffered a bump on the head. Later that evening, after the boy was feeling ill, his parents took him to an emergency room, where he was examined by a neurosurgeon. The neurosurgeon failed to detect the necessity for emergency surgery, and the boy died several days later from a hemorrhage caused by a hairline fracture of his skull. Expert testimony indicated that both the emergency care physician at the stadium and the neurosurgeon were negligent in their treatment of the boy, and that he likely would have made a virtually complete recovery if a proper diagnosis had been made.56 Cal.App.3d at 624-29, 128 Cal.Rptr. at 811-14.
In a lawsuit against the physicians, the jury found for the defendants and the trial court entered a judgment based on that verdict. The California Court of Appeals reversed. The appellate court held that the trial court had failed to give a proper jury instruction on concurrent causes, an instruction to the effect that the subsequent negligence of the neurosurgeon was no defense to a claim alleging the stadium physician's initial negligence if the jury found that negligence on the part of both had proximately caused the boy's death. Id. at 639,128 Cal.Rptr. at 821. In so holding, the appellate court rejected the stadium physician's argument that his liability for the boy's death had been cut off under § 452(2) of theRestatement on the basis that the duty to prevent harm had shifted to the neurosurgeon. Id.
As in Fish, the doctors in this present case were acting independently of each other, with no express or implied agreements to assume any responsibilities of the others. As theSiggers court noted of the doctors in Fish, "[t]heir only connection was that they had both negligently examined the same boy." 906 F.2d at 246. We have a similar situation in this case. To adopt the position urged by Dr. Looney would, in effect, require that we overrule our cases holding that subsequent *Page 162 
negligent medical care is not a superseding cause of injury. We decline to do so.
As to Dr. Looney's argument that Mrs. Davis's death from a negligent tooth extraction was simply unforeseeable, we note that this contention goes only to the question of the foreseeability of the extent of harm that she suffered. That is, Dr. Looney admitted that he is very concerned about the medical consequences of excessive or continued bleeding and that, had he been aware of Mrs. Davis's liver condition, he would not have extracted the tooth without first referring her to a physician to protect against just such consequences. Thus, he apparently concedes that it was foreseeable both that a negligent failure to discover Mrs. Davis's liver disease before extracting her tooth could cause her to suffer injury resulting from continued blood loss generally, and that this type of injury could be potentially serious. Dr. Looney merely contends, rather, that no one would reasonably contemplate that she would actually die from such blood loss.
However, this Court has stated:
 "`"`As regards proximate cause . . . it is not necessary to a defendant's liability, after his negligence has been established, to show, in addition thereto, that the particular consequences of his negligence could have been foreseen by him; it is sufficient that the injuries are the natural, although not the necessary and inevitable, result of the negligent fault — such injuries as are likely, in ordinary circumstances, to ensue from the act or omission in question.' 38 Am.Jur., § 62, p. 714."'"
Lawson v. General Tel. Co. of Alabama, 289 Ala. 283,289, 267 So.2d 132, 138 (1972), quoting Sullivan v. AlabamaPower Co., 246 Ala. 262, 268, 20 So.2d 224, 228 (1944). It has also been similarly said that "it is not necessary that every detail of damage which is the ordinary and natural result [of one's negligence] be contemplated." Sloss-SheffieldSteel Iron Co. v. Wilkes, 236 Ala. 173, 178,181 So. 276, 279 (1938).
Thus, generally a defendant may be found liable if some physical injury of the general type the plaintiff sustained was a foreseeable consequence of the defendant's negligent conduct, even though the extent of the physical injuries may have been quite unforeseeable. Indeed, it has been noted, "There is almost universal agreement upon liability beyond the risk, for quite unforeseeable consequences, when they follow an impact upon the person of the plaintiff." W. Page Keeton et al., Prosser andKeeton on the Law of Torts § 43, at 291 (5th ed. 1984) (footnote omitted). See also 65 C.J.S. Negligence
§ 109 (1966). For example, in Armstrong v. Montgomery StreetRy. Co., 123 Ala. 233, 26 So. 349 (1899), the Court held that negligence that caused an injury to one's finger, which injury produced blood poisoning that caused death, was the proximate cause of the death:
 "The fall produced the injuries; the injuries produced blood poisoning, and the blood poisoning produced death. There was no break in the chain of causation from the alleged negligent act to the death of [the] intestate. The blood poisoning was not an independent cause. It was not a superseding cause. It was itself a result, or, perhaps more accurately, a mere development of the injuries. It is not an important consideration, even if it be a fact, that blood poisoning is not a usual and ordinary result or development of wounds of the character inflicted upon the intestate."
Id., at 249, 26 So. at 353.
It has been similarly suggested that where the defendant's negligent conduct proximately causes a personal injury, a peculiar physical infirmity of the plaintiff that aggravates the extent of an otherwise foreseeable injury is not generally a defense to liability. In Foley v. Pioneer Min. Mfg.Co., 144 Ala. 178, 40 So. 273 (1906), it was alleged that the defendant's failure to provide adequate ventilation in its mine had caused the death of its employee, who by that failure was exposed to noxious gas. The defendant employer claimed that its negligence was not the proximate cause of death, because, the defendant argued, the employee's "physical weakness was shown and it was further shown that his helper was not affected by the gas." Id. at 181, 40 So. 273 (the quoted argument appears in the official report; the counsel's argument is not included in the opinion as published at *Page 163 
40 So. 273). The Court rejected that argument, holding, "If the negligence of the defendant was the proximate cause of the death of [the] plaintiff's intestate, the fact that the weak physical condition of the deceased contributed in a measure to his death, would not acquit of liability." Id. at 183, 40 So. at 275. See also 65A C.J.S. Negligence § 134 (1966).
The cases cited by Dr. Looney merely demonstrate that a defendant cannot be held liable when the kind of physical injury sustained by the plaintiff was itself unforeseeable. SeeWilliamson v. Tyson Foods, Inc., 626 So.2d 1261
(Ala. 1993) (held unforeseeable that employee who brought his minor child with him to his place of employment upon the defendant's premises would fail to protect the child from an injury caused by a dangerous condition well known to the employee); Littleton v. Alabama Power Co.,243 Ala. 492, 10 So.2d 757 (1942) (holding that the defendant, in failing to insulate its power line, did not breach a duty owed to child who was injured when her kite came into contact with the line, because it was not customary for kites to be flown in that area and thus the injury was unforeseeable). Neither of these cases indicates that the unlikely extent, i.e., the unexpected seriousness, of a personal injury operates as a defense when the kind of injury is itself foreseeable. Thus, the trial court properly denied Dr. Looney's motions for a directed verdict and for a judgment notwithstanding the verdict.
 IV. New Trial
Dr. Looney next contends that the trial court erred in denying his motion for a new trial. He raises nine issues regarding that ruling, but because we conclude that the judgment in this case must be reversed because the trial court erred in overruling Dr. Looney's Batson[2] motion, we pretermit any discussion of his other new trial arguments and the question whether the amount of the judgment against him was excessive.
During jury selection, the plaintiff used peremptory strikes to remove 16 of the 17 white jurors on the venire. Counsel for Bryan Whitfield Hospital used a peremptory strike to remove the only other white member of the venire; that veniremember had indicated that she had had a bad experience with a hospital. Dr. Looney's counsel objected to five of the plaintiff's strikes of the white veniremembers, arguing the sole basis for these strikes was race. Although it made no express finding that the strikes established a prima facie case of discrimination, the trial court required plaintiff's counsel to give race-neutral explanations for those strikes. Plaintiff's counsel gave his explanations, and the trial court accepted the reasons as race-neutral and valid.
On appeal, Dr. Looney questions the explanations provided by plaintiff's counsel regarding the striking of one of the white veniremembers, K.H. Dr. Looney does not on appeal challenge the explanations offered for striking the other white veniremembers, but we note that the removal of even one juror for a racially discriminatory reason is a violation of the equal protection rights of both the excluded juror and the party challenging the peremptory strike. Ex parte Jackson, 640 So.2d 1050
(Ala. 1993); Ex parte Bird, 594 So.2d 676 (Ala. 1991). When counsel was asked his reason for striking K.H., his full response was as follows:
 "[K.H.] works at the University [of West Alabama]. His wife is from Livingston, and he's been here all his life. His family has been active politically. It's my judgment that he would know the Looney family from the country club [to which Dr. Looney belonged] as well as social activities. And that is the basis."
However, after this explanation was tendered, Dr. Looney's counsel immediately responded by stating that there was no basis whatever for opposing counsel's assumption that K.H. knew Dr. Looney or his family, because K.H. had not responded when the plaintiff's counsel had specifically asked during voir dire whether anyone on the venire knew Dr. Looney or whether anyone was a member of the country club to which Dr. Looney belonged.
This Court has recognized that both the Alabama Constitution
and the Federal Constitution prohibit a prosecutor from *Page 164 
challenging a potential juror solely on account of his or her race, or on the assumption that members of a particular race, as a cognizable group, will be unable to impartially consider a case. Ex parte Branch, 526 So.2d 609, 621 (Ala. 1987) (interpreting Batson, supra, and Ex parteJackson, 516 So.2d 768 (Ala. 1986)). This prohibition against the racially discriminatory use of peremptory strikes applies also in civil cases. Thomas v. DiversifiedContractors, Inc., 551 So.2d 343 (Ala. 1989). See alsoEdmonson v. Leesville Concrete Co., 500 U.S. 614,111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Under Alabama's peremptory challenge procedure set out in Ex parte Branch, supra, the party alleging a discriminatory use of peremptory challenges bears the initial burden of establishing a prima facie case of discrimination. 526 So.2d at 622. After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate on the basis of race.Id. at 623. "The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to betried, and which is nondiscriminatory." Id.
(emphasis in original).
 "In evaluating the evidence and explanations presented, the trial judge must determine whether the explanations are sufficient to overcome the presumption of bias. . . . The trial judge cannot merely accept the specific reasons given by the prosecutor at face value . . .; the judge must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination."
Id. at 624 (citations omitted).[3] After race-neutral reasons are articulated, the moving party can offer evidence showing that the reasons or explanations given constitute merely a sham or pretext. Id. at 624. The trial court's ruling on the question whether the responding party offered legitimate race-neutral reasons will not be overturned unless it is clearly erroneous. Olsen v. Rich, 657 So.2d 875 (Ala. 1995) (citations omitted).
We initially note that the plaintiff seems to imply that we should not review the reasons given for striking K.H. because the trial court made no express finding that a prima facie case of discrimination was established. We disagree. If the trial court does not make an express finding that a prima facie case of discrimination has been established, but nonetheless orders counsel to articulate valid race-neutral explanations for peremptory strikes, the preliminary issue of a prima facie case becomes moot and this Court will proceed directly to an evaluation of the explanations given. See Norfolk SouthernRy. v. Gideon, 676 So.2d 310, 312 (Ala. 1996); Huntleyv. State, 627 So.2d 1013 (Ala. 1992); Taylor v.State, 666 So.2d 36 (Ala.Cr.App. 1994); Williams v.State, 548 So.2d 501 (Ala.Cr.App. 1988), cert. denied,489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989); Currin v.State, 535 So.2d 221 (Ala.Cr.App.), cert. denied,535 So.2d 225 (Ala. 1988); Hernandez v. New York, supra,500 U.S. at 358-60, 111 S.Ct. at 1865-67.
We hold that the trial court abused its discretion in finding that the reasons given by plaintiff's counsel for striking K.H. were not merely pretextual. The particular ground stated by plaintiff's counsel for the strike was that it was his "judgment" that K.H. would know the Looney family through the country club to which Dr. Looney belonged or through "social activities." *Page 165 
We acknowledge that "[s]trikes based on the veniremember's relationship to or acquaintance with the defendant or with the defendant's witnesses have generally been upheld." Rowe v.State, 625 So.2d 1210, 1211 (Ala.Cr.App. 1993). However, "intuitive judgment or suspicion by [the proponent of the strike] is insufficient to rebut the presumption of discrimination." Ex parte Branch, supra, at 623. Thus, Alabama caselaw indicates that strikes based upon counsel's mere suspicion alone that a veniremember has a relationship that would constitute a valid, race-neutral reason will not be upheld, especially if on voir dire examination there was no inquiry into whether the suspected relationship actually exists.
In Ex parte Bird, supra, for example, a prosecutor stated that she struck a black woman from the venire because, among other reasons, the prosecutor suspected that the woman was related to a person, once prosecuted by the district attorney's office, who had the same last name as the defendant.594 So.2d at 679. However, during voir dire examination neither the prosecutor nor the court had inquired into whether this suspected relationship truly existed. Id. at 683. Previous cases had clearly held that a prospective juror's family relationship with someone with a past criminal history was a valid race-neutral reason for a peremptory strike. See, e.g., Stephens v. State, 580 So.2d 11, 19
(Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.), cert. denied,502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991). This Court nonetheless held that the trial court had abused its discretion in accepting the prosecutor's mere suspicion of such a relationship as a sufficient nondiscriminatory explanation:
 "[T]he failure of the State to engage in any meaningful voir dire on a subject of alleged concern is evidence that the explanation is a sham and a pretext for discrimination. Branch, 526 So.2d at 623; see also People v. Wheeler, 22 Cal.3d 258, 281, 583 P.2d 748, 764, 148 Cal.Rptr. 890, 905 (1978); Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App. 1987). Thus, if the [prosecutor] thinks that a veniremember may be related to a former defendant, she must ask the veniremember. See State v. Aragon, 109 N.M. 197, 784 P.2d 16, 17 (1989); see also Floyd v. State, 539 So.2d 357, 363 (Ala.Crim.App. 1987) (mere suspicion of a relationship insufficient); Note, [Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection, 74 Va. L. Rev. 811, 827 (1988)] (`prosecutor's self-imposed ignorance [should not] preclude a Batson claim').
 "Here, a simple question directed to the veniremember could have dispelled any doubt about a possible relationship. However, neither the State nor the court engaged in any voir dire on this subject. In the absence of any examination, the trial judge had nothing on which to make the required `sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as he [knew] them.' Branch, 526 So.2d at 624. In reality, he had nothing on which to base an evaluation of the proffered rationale except the averment of the [prosecutor], which, in substance, amounted to a `mere general assertion' of nondiscrimination. See Batson, 476 U.S. at 94, 106 S.Ct. at 1721."
594 So.2d at 683. See also Carroll v. State,639 So.2d 574 (Ala.Cr.App. 1993); Walker v. State, 611 So.2d 1133
(Ala.Cr.App. 1992); Hemphill v. State, 610 So.2d 413
(Ala.Cr.App. 1992) (holding that the trial court erred in accepting the prosecutor's mere suspicion that two veniremembers would know the defendant or defense counsel, when voir dire responses were to the contrary and prosecutor made no further inquiry into that issue). But see Weaver v. State,678 So.2d 260 (Ala.Cr.App. 1995); Newman v. State,667 So.2d 137 (Ala. 1993); Naismith v. State,615 So.2d 1323 (Ala.Cr.App. 1993); and Jones v. State,611 So.2d 466 (Ala.Cr.App. 1992) (each upholding peremptory strikes based on a veniremember's alleged criminal history or family relationship with former defendants, where there was something more than mere suspicion to support the belief in the existence of the stated reason).
There is nothing more than mere suspicion that K.H. knew Dr. Looney or his family. In fact, the suspicion that the relationship causing the alleged concern actually existed is even weaker than the suspicion was in Ex *Page 166 parte Bird. In that case, the prosecutor simply failed to ask the question that would have served to confirm or deny his suspicion that the family relationship in question existed. Here, counsel actually did pose questions to the entire venire regarding whether any of the members were acquainted with Dr. Looney or his family, but K.H. indicated, by his lack of a response, that he did not know Dr. Looney or his family, either from the country club or otherwise. SeeHemphill, supra. Nothing in the record indicates that the contrary is true, or that counsel had any basis, aside from pure speculation, to believe it was true. Plaintiff's counsel did engage in a brief dialogue with K.H., but he confirmed only that K.H. worked as an electrician at the University of West Alabama and that his wife also worked there as an admissions counselor. If plaintiff's counsel was concerned that K.H. knew Dr. Looney or his family, despite his earlier indications to the contrary, he had to ask him. Ex parte Bird; Ex parteHemphill, supra. Thus, we hold that the trial court erred in finding that the speculation of plaintiff's counsel that K.H. knew Dr. Looney or his family was sufficient to rebut the presumption of discrimination.
The plaintiff also argues that the strike of veniremember K.H. was justified based upon (1) his employment as an electrician at the University of West Alabama, (2) the fact that K.H.'s wife also worked there as an admissions counselor, and (3) the alleged fact that K.H. is a member of a family that is "active politically."
This Court has recognized: "`It is a fact of life that no matter how honest and conscientious an individual may be, he is most likely to be influenced, if not actually biased, by his past or present occupational experiences.'" BurlingtonNorthern R.R. v. Whitt, 575 So.2d 1011, 1018 (Ala. 1990), cert. den., 499 U.S. 948, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991), quoting Landers v. Long, 53 Ala.App. 340, 343,300 So.2d 112, 114 (Ala.Civ.App. 1974). Therefore, "[t]he fact that a peremptory strike was based on a potential juror's occupation does not automatically create a suspicion of racial bias."Meads v. RPM Pizza, Inc., 639 So.2d 1352, 1354
(Ala. 1994). Indeed, a "[f]actor[] such as . . . employment [is] accepted as [a] legitimate reason[] for peremptory strikes where [that] factor[], under the circumstances of the case, might make the potential jurors sympathetic to, or able to more easily identify with, a particular party." Olsen v. Rich, supra, at 879. Thus, Alabama cases have upheld peremptory strikes based upon the fact that a veniremember's experience as an insurance adjuster might affect his view of assessing damages in a personal injury case, see Breland v. Ford,693 So.2d 393, 400 (Ala. 1996); and where a veniremember's employment as a nanny or nurse might tend to generate sympathy toward one party, see Meads, supra, at 1353-54; Millette v.O'Neal Steel, Inc., 613 So.2d 1225, 1230 (Ala. 1992);Powell v. State, 608 So.2d 411 (Ala.Cr.App. 1992). In contrast, strikes allegedly based upon a veniremember's occupation have not been upheld where the employment does not appear in any way to "relate[] to the particular case to be tried," Ex parte Branch, at 623. See, e.g., Carterv. State, 603 So.2d 1137, 1139 (Ala.Cr.App. 1992) (reversing trial court's finding that reason for strike in a criminal case — the potential juror's occupation as a sales clerk — was nonpretextual); McGahee v. State,554 So.2d 454, 461 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala. 1989) ("The explanation that [the veniremember] was struck because he was a teacher is not, without more, a legitimate non-discriminatory reason"); Williams v. State, 548 So.2d 501, 507
(Ala.Cr.App. 1988) ("No explanation was offered to explain why a school teacher, a college counselor, a school lunchroom worker, or a person connected with a mental health organization would be against, rather than in favor of, the prosecution.")
The plaintiff offered no explanation, either to the trial court or to this Court, why K.H.'s occupation as an electrician indicates that he would tend to be against the plaintiff or how his employment bears any relation whatever to this medical malpractice case. Nor has the plaintiff demonstrated the significance of the fact that K.H. and his wife both are employed by the local state university, which has no discernible connection to this case. We note that nothing in the record beyond counsel's bare assertion suggests that *Page 167 
K.H. is a member of a family that is "active politically." But, even assuming that the assertion was true, there was no evidence indicating the nature, the extent, or the political persuasion of such activism, or how it might relate to this case. Neither plaintiff's counsel nor the trial court questioned K.H. during voir dire about either his political activities or beliefs or those of his family. Thus, we conclude that none of the reasons offered by the plaintiff for striking K.H. from the venire could, by itself, overcome the presumption of discrimination in this case. Nor could all the reasons do so when taken together. A party "may not cure the constitutional deficiency of an explanation simply by augmenting it with similar excuses none of which, standing alone, would be sufficient." Ex parteBird, supra, at 683.
For the reasons stated above, we conclude that the trial court properly held that Dr. Looney was not entitled to a judgment notwithstanding the verdict. However, because the trial court erred in accepting as race-neutral the plaintiff's explanation for striking the veniremember K.H., we reverse the judgment and remand the case for a new trial.
REVERSED AND REMANDED.
HOUSTON, KENNEDY, COOK, and BUTTS, JJ., concur.
HOOPER, C.J., concurs in the result.
SEE, J., concurs in part and dissents in part.
[1] While the plaintiff sued Bryan Whitfield Hospital, he did not sue Dr. Paul Ketcham, the emergency room physician who had treated Mrs. Davis at that facility.
[2] See Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[3] We note that the United States Supreme Court originally interpreted the 14th Amendment to the United States Constitution to require a similar standard of scrutiny of reasons offered for an allegedly discriminatory peremptory strike. TheBatson decision stated that the proponent of a strike must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the strike and demanded that the reasons be "related to the particular case to be tried."476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20. However, we recognize that the subsequent decisions of the United States Supreme Court in Hernandez v. New York, 500 U.S. 352,111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and Purkett v.Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), can be interpreted to ease the federal standard. See Brunerv. Cawthon, 681 So.2d 161, 170-72 (Ala.Civ.App. 1995). However, Hernandez and Purkett do not govern Alabama's peremptory challenge procedure, which rests upon adequate and independent state law. Ex parte Bruner,681 So.2d 173 (Ala. 1996). Thus, regarding the scrutiny that a trial court is to apply to reasons offered by a proponent of a peremptory strike, we adhere to the Alabama standard declared inEx parte Branch, supra.