COBB, Chief Justice
(dissenting).
I respectfully dissent from the majority’s decision to affirm the summary judgment in this case.

Facts

[10]

Greg and Melinda Groover have three children, the youngest of whom, Lennon, was born on October 29, 1999.[11] Although he was developmentally normal at birth, his subsequent development soon began to concern his mother. According to Lennon’s mother, she had planned to breastfeed Lennon exclusively until he was six months old, then breast feed him until he was 18 months old while supplementing his diet with solid food, as she had done with her two older children. However, when Melinda attempted to supplement his diet with solid food, he was unable to swallow it.
By the time Lennon was nine months old, he was still unable to swallow solid food; he was not able to sit up without support or to crawl, and he did not say any words. At this time, Lennon’s mother took him to Dr. Johnston for a routine appointment. Lennon’s mother asked Dr. Johnston if she should introduce formula into Lennon’s diet, but Dr. Johnston ad *47 vised her that it was not a good idea to introduce formula and that breast-feeding provides “complete nutrition” for a child up to the age of 18 months. Dr. Johnston further informed Lennon’s mother that Lennon had difficulty swallowing solid food because he had a birth defect in his tongue commonly known as being- “tongue-tied.” Dr. Johnston informed Lennon’s mother that, when Lennon reached the age of 18 months, Lennon would need to undergo a procedure to correct the defect and at that point he would be able to swallow solid food. After this appointment, based on Dr. Johnston’s advice, Lennon’s mother did not introduce formula but continued to breast-feed Lennon’ exclusively. She also attempted to feed Lennon “solid” food (such as mashed potatoes and apple sauce) in addition to breast milk, but she was unsuccessful because Lennon could not swallow the food.
In October 2000, at the age of 12 months, Lennon still had not begun to crawl. He rarely turned over on his own. He could walk only if an adult assisted him by holding both his hands. Lennon’s mother again took him to Dr. Johnston. Dr. Johnston drew blood to test Lennon for microcytic anemia (iron deficiency) and' set up an appointment for Lennon to return two weeks later for follow-up on the results of the test.
At the follow-up appointment in November 2000, Dr. Johnston informed Lennon’s mother than Lennon had an iron deficiency. At this time, Lennon’s mother asked if Lennon could have a B-12 deficiency. Dr. Johnston replied that Lennon could not have a B-12 deficiency, and that the anemia test revealed that Lennon had small blood cells, which were indicative of an iron deficiency.
In February 2001, when Lennon was about 15 months, his mother noticed that he was pulling on his fingers and touching his lips. In reading about iron deficiency following Lennon’s diagnosis, she had discovered literature indicating that a B-12 deficiency causes tingling in the fingers. She took Lennon to Dr. Johnston for another appointment, and she informed Dr. Johnston about Lennon’s habit of pulling on his fingers and touching his lips. She expressed concern that perhaps Lennon’s fingers were tingling and asked if Lennon might have a B-12 deficiency that was causing him to pull on his fingers and touch his lips. Dr. Johnston replied, “Well, he’s not doing it now.” He told Lennon’s mother that Lennon did not have a B-12 deficiency and that the test results indicated that Lennon’s blood cells were larger than before, which, Dr. Johnston informed the mother, indicated that Lennon was recovering from the iron deficiency.
At the time of Lennon’s checkup at the age of 15 months, Dr. Johnston was still unconcerned about Lennon’s developmental delays. He explained that Lennon was a big baby and that he was still weak from the iron deficiency. Lennon’s mother asked that he be referred to a physical therapist, -but Dr. Johnston told her that Lennon did not need physical therapy. However, he gave Lennon’s mother some exercises to do with Lennon, which she did.
In August 2001, when Lennon was 21 months old, his mother again took him to Dr. Johnston. Referring to Lennon’s continued developmental delays, she said to Dr. Johnston, “It’s got to be B-12 anemia.” Dr. Johnston responded, “Nobody gets B-12 anemia. Lennon is getting enough B-12 from your breast milk.” Dr. Johnston put Lennon on Poly-Vi-Sol, a vitamin supplement, which provided some iron, folic acid, and B-12. He then referred Lennon to Dr. Holly Mussell for further evaluation of Lennon’s muscular weakness.
*48 In November 2001, Lennon’s mother obtained Lennon’s medical records from Dr. Johnston. When she looked at the medical records, Lennon’s mother noticed that Lennon had not had normal blood-test results since he was 12 months old. She requested that Dr. Mussell schedule a B-12 test, and Dr. Mussell ordered the test.
In December 2001, the mother took Lennon to Dr. Johnston’s office to have blood drawn for the B-12 test because Lennon’s blood was so thick that technicians at Children’s Hospitál in Birmingham were unable to obtain a sample. Lennon’s blood was so thick and clotted so quickly that the medical technicians at Dr. Johnston’s office were unable after five attempts to obtain a sample for testing. Dr. Johnston took a “smear” of Lennon’s blood to a hematologist to consult with him about the test. The hematologist confirmed that Lennon had a B-12 deficiency. Dr. Johnston quickly began treating Lennon with B-12 shots. After Lennon began taking B-12 shots, according to Lennoñ’s mother, Lennon’s condition began to improve “right away.” Dr. Johnson noted improvement when he treated Lennon at his next visit on February 1, 2002.
It is undisputed that Lennon suffered permanent brain damage as a result of the prolonged B-12 deficiency. According to Dr. Steven Shore, the Groovers’ expert witnesses, who is a pediatrician, Dr. Johnston breached the standard of care by failing to recognize the significance of Lennon’s developmental delays and to timely refer him to a qualified hematologist or other specialist. Dr. Shore testified by affidavit that, because of Dr. Johnston’s delay in sending Lennon to a qualified hematologist or other specialist, Lennon’s macrocytic anemia (i.e., B-12 deficiency) was undiagnosed for at least an additional six months. Dr. Shore opined that, during those six months, Lennon did not receive the necessary medical treatment, which resulted in the further deterioration of his condition.
Lennon could not walk until he was two and one-half years old, and he could walk then only with the assistance of a walker. At the time Lennon’s mother’s deposition was taken in this case, Lennon was in the first grade. At that time, Lennon had selective mutism, was in special-education and occupational-therapy classes at school, and could not speak well or write well. The results of an IQ test indicate that Lennon has an IQ of 60.
The Groovers sued Dr. Johnston, Birmingham Pediatric Associates, Inc., and others. The trial court entered a summary judgment in favor of Dr. Johnston and Birmingham Pediatric Associates, Inc., and the Groovers appealed.

Analysis

I. The Merits

As evidence that Dr. Johnston’s alleged failure to timely refer Lennon to a hematologist or other specialist proximately and probably caused injury to Lennon, the Groovers rely on an affidavit from one of their expert witnesses, Dr. Shore, a pediatrician. Dr. Shore testified in that affidavit as follows:
“William H. Johnston, M.D., did not comply with the applicable standard of care for a board certified pediatrician with respect to the care and treatment rendered to Lennon Groover.
“William H. Johnston, M.D., breached the standard of care by failing to recognize Lennon Groover[’]s developmental delays and refer the child out to qualified specialists in a timely manner.
‘“Dr. William H. Johnston’s delay in sending the child to a qualified hematologist or other specialist resulted in the child’s macrocytic anemia [i.e., B-12 deficiency] being undiagnosed for at least *49 an additional six (6) months. During that period the child did not receive the necessary medical treatment resulting in his condition further deteriorating.”
The trial court relied on McAfee v. Baptist Medical Center, 641 So.2d 265 (Ala.1994), to hold that Dr. Shore’s affidavit was insufficient to create a germine issue of material fact as to whether Dr. Johnston negligently caused a delay in Lennon’s diagnosis and treatment, which, in turn, caused Lennon’s condition to deteriorate. Finding no evidence of causation in light of McAfee, the trial court entered a summary judgment for Dr. Johnston and Birmingham Pediatric Associates, Inc.[12]
The fundamental flaw in the trial court’s logic is that, in entering the summary judgment, the trial court incorrectly characterized the Groovers’ reliance on Dr. Shore’s affidavit as an attempt to rely on the “loss-of-chance” doctrine, which this Court expressly and soundly rejected in McAfee. The loss-of-chance doctrine is the proposition that “the loss-of-chance (to achieve a better medical outcome)” is a compensable injury in a medical-malpractice case. McAfee, 641 So.2d at 267 n. 2. Thus, in accordance with the rejection of the loss-of-chance doctrine in McAfee, Alabama evidence indicating that a delay in medical treatment could have caused a patient’s condition to worsen is not sufficient to sustain an action based on medical negligence absent evidence that the patient’s condition probably did in fact worsen as a probable and proximate result of the delay. See generally McAfee; see also Crutcher v. Williams, 12 So.3d 681 (Ala.2009) (relying on McAfee to hold that evidence indicating that delayed treatment merely caused loss of chance to prevent further injury did not satisfy the plaintiffs burden to prove that she actually incurred an injury that was probably and proximately caused by the delay in treatment).[13] This is because evidence that an injury could have occurred as alleged is not sufficient to warrant the conclusion that it probably did so occur. McAfee, 641 So.2d at 267. Put another way, under McAfee, mere evidence that “generally, the sooner the onset of treatment, the better the expected result,” McAfee, 641 So.2d at 268 (emphasis added), is not sufficient to prove that a delay in treatment of a particular patient caused a worsening of that patient’s condition. See McAfee, 641 So.2d at 267 (holding that the plaintiffs failed to “submit substantial evidence that [the plaintiffs’] conditions worsened as a direct result” of the delay in treatment in their particular cases).
*50 Thus, McAfee simply applied the longstanding rule in Alabama that, to prevail on a medical-malpractice claim based on a delay in providing medical treatment, the plaintiff must prove that a breach of the standard of care, i.e., the delay in treatment, proximately and probably caused actual injury to the plaintiff. See McAfee 641 So.2d at 267 (“ ‘[T]here must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury. There must be evidence that the negligence probably caused the injury.’ ” (quoting Baker v. Chastain, 389 So.2d 932, 934 (Ala.1980))). “This has been the standard in Alabama for decades.” 641 So.2d at 267.[14]
However, the McAfee court went to considerable effort to make it abundantly clear that it was not holding that a summary judgment for the defendant was appropriate when the plaintiff presented evidence indicating that the plaintiffs condition probably worsened as a direct result of delay in diagnosis and treatment. See McAfee, 641 So.2d at 267-68 (discussing this point at length and reaffirming the validity of Parker v. Collins, 605 So.2d 824 (Ala.1992)).
Unlike the plaintiffs in McAfee, the Groovers do not take the position that they should be compensated for the mere loss of a chance to prevent further brain damage to Lennon. Rather, they are seeking damages for an actual, physical injury: the further deterioration of Lennon’s brain injury, which, they allege, was caused by Dr. Johnston’s failure to refer Lennon to a hematologist or other qualified specialist. Dr. Shore’s affidavit goes beyond suggesting mere loss of a “chance” to prevent or reduce further deterioration of Lennon’s condition. He opines that the purportedly negligent delay in treatment actually “result[ed] in” a real physical injury: “the deterioration of [Lennon’s] condition.” Cf. McAfee, 641 So.2d at 267 (reaffirming the principle that evidence that a plaintiff’s condition “ ‘worsened as a direct result’ ” of a delay in treatment is sufficient to create a jury question as to probable cause (quoting Parker, 605 So.2d at 827 (emphasis omitted))). This is simply not a loss-of-chance case, and McAfee is therefore inapposite.
Moreover, under the plain language of McAfee, it was not necessary for Dr. Shore to testify that Lennon would not have suffered irreversible brain injury if he had received prompt care. There can be different degrees of irreversible brain damage. Under McAfee, it is sufficient that Dr. Shore’s testimony shows that Lennon’s permanent brain injury was worse than it otherwise would be as a probable result of Dr. Johnston’s negligence. Although Dr. Shore’s affidavit certainly does not exclude the possibility that Lennon would have had irreversible brain damage even had Dr. Johnston acted sooner, Dr. Shore certainly did testify that Dr. Johnston’s negligence “resulted] in [Lennon’s] condition further deteriorating” — i.e., that Lennon’s injuries were worse than they otherwise would have been[15] in the absence of Dr. Johnston’s negligence. Thus, Dr. Shore’s affi *51 davit does exclude the possibility that the extent of Lennon’s brain damage would have been the same absent a delay in .the diagnosis and treatment of his disease. Under McAfee, this is clearly sufficient. This Court stated in McAfee:
“ ‘[T]he issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position .than she was in as a result of inferior medical care. Waddell v. Jordan, 293 Ala. 256, 302 So.2d 74 (1974); Murdoch v. Thomas, 404 So.2d 580 (Ala.1981). It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence. Waddell; see also Annot. 54 A.L.R.4th 10 § 3 (1987).’ ”
McAfee, 641 So.2d at 267 (quoting Parker, 605 So.2d at 827 (emphasis added)).
In fact, the trial court itself appeared to have had no trouble finding that the Gro-overs had submitted evidence from which one could reasonably conclude that, as a result of a delay in treatment caused- by Dr. Johnston’s negligence, Lennon’s condition was worse than it otherwise would have been. (See, e.g., the trial court’s finding that the Groovers’ expert medical witnesses testified, in essence, that “Lennon’s brain damage had commenced prior to the time that it should have been discovered by [Dr. Johnston], and that the delay in treatment and diagnosis meant that [Lennon] suffered a further, though unquantifiable,[16] deterioration of his health.”) Logically, this finding amounts to a finding of causation, and it ought to lead to a reversal of the summary judgment on the Groovers’ claim that Dr. Johnston negligently caused Lennon’s condition to further deteriorate.
The Groovers did not discuss McAfee in their arguments before this Court. However, their failure to address McAfee does not make their case a loss-of-chance case. Because it is apparent from the plain language of McAfee that it is inapposite where, as here, there is evidence indicating that a delay in treatment proximately caused injury to the plaintiff, I cannot conclude that the Groovers’ failure to address McAfee necessarily means we must approve of or facilitate its misapplication in this case at Dr. Johnston and Birmingham Pediatric Associates, Inc.’s urging.
In conclusion, I have never more strongly disagreed with a decision of this Court than I do with its decision in this case. By its own express and careful language, McAfee could not be more clear or explicit that it applies in cases where there is no evidence that the loss of a chance to prevent injury ever actually or probably resulted in an injury to the plaintiff, but that it does not bar recovery where there is evidence indicating that a plaintiff’s condition worsened as a direct result of a delay in treatment. By its own findings, the trial court recognizes that Dr. Shore’s affidavit is sufficient evidence to create a genuine issue as to whether some portion of Lennon’s brain damage was caused by a
*52 delay in treatment caused by negligence on the part of Dr. Johnston. Therefore, this is not a mere loss-of-chance case, and McAfee is simply inapposite. Accordingly, the trial court erred by entering a summary judgment for the defendants in reliance on McAfee.

II. Dr. Shore’s Affidavit

I respectfully disagree with Justice Smith’s assertions in her special writing that Dr. Shore’s affidavit leaves open the possibility that timely referral to the appropriate specialists might not have led to an earlier diagnosis of Lennon’s condition. Dr. Shore stated in his affidavit: “Dr. William H. Johnston[’]s delay in sending the child to a qualified hematologist or other specialist resulted in the child’s ma-crocytic anemia [i.e., B-12 deficiency] being undiagnosed for at least an additional six (6) months.” It is hard to imagine how Dr. Shore could have more clearly indicated (1) that Dr. Johnston’s negligent delay in referral caused (“resulted in”) (2) a six-month delay in diagnosis of Lennon’s B-12 deficiency.
Admittedly, Dr. Shore did not in so many words state that (1) the six-month delay in diagnosis of Lennon’s B-12 deficiency, “caused” (2) Lennon not to receive the necessary medical treatment for a B-12 deficiency during that period. Instead, Dr. Shore stated:
“Dr. William H. Johnston[’]s delay in sending the child to a qualified hematologist or other specialist resulted in the child’s macrocy tic anemia [i.e., B-12 deficiency] being undiagnosed for at least an additional six (6) months. During that period the child did not receive the necessary medical treatment resulting in his condition further deteriorating.”
As Justice Smith suggests, Dr. Shore’s wording technically leaves open a remote theoretical possibility that Dr. Johnston or some other physician might have negligently failed to provide “the necessary medical treatment” for Lennon’s B-12 deficiency even if Lennon’s condition had been timely diagnosed. As McAfee makes clear, however, courts are not concerned with what is “possible,” only with what is “probable,” i.e., more likely than not to occur in a given set of circumstances. Even without further medical testimony, a juror could reasonably infer that a timely diagnosis of Lennon’s condition would probably have led to Lennon timely receiving “the necessary medical treatment ” for that condition. See West v. Founders Life Assurance Co. of Fla., 547 So.2d 870, 871 (Ala.1989) (“[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”).
Additionally, Dr. Shore concluded: “During that period [the six-month delay in diagnosing Lennon’s B-12 deficiency caused by Dr. Johnston’s negligence] the child did not receive the necessary medical treatment resulting in his condition further deteriorating.” If the delay in treatment “resulted in” Lennon’s condition “further deteriorating,” then it necessarily caused Lennon’s condition to be worse than it otherwise would have been.
Thus, a reasonable person could fairly conclude from Dr. Shore’s affidavit that, in Dr. Shore’s opinion, the delay in treatment (caused by a delay in diagnosis resulting from Dr. Johnston’s negligence) proximately caused Lennon’s condition to be worse that it otherwise would have been. Therefore, Dr. Shore’s affidavit is sufficient to establish a genuine factual issue as to probable cause. One can conclude otherwise only by taking an overly technical view of the affidavit and by failing to draw from it those reasonable inferences that *53 fairly support the Groovers’ causation theory. See Rule 56, Ala. R. Civ. P. (Committee Comments on 1978 Adoption) (quoting Whitaker v. Coleman, 115 F.2d 305, 307 (5th Cir.1940)) (“ ‘Summary judgment procedure is not a catch-penny contrivance to take unwary litigants into its toils and deprive them of trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not , to cut litigants off from their right of trial by jury if they really have evidence which they will offer on a trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists.’ ”); Ex parte Wood, 852 So.2d 705, 708 (Ala.2002) (noting that, in reviewing a summary judgment, the appellate court “must view the record in the light most favorable to the nonmoving party, accord the nonmoving party all reasonable favorable inferences from the evidence, and resolve all reasonable doubts against the moving party”); Swendsen v. Gross, 530 So.2d 764 (Ala.1988).
Justice Smith finds it significant that Dr. Shore did not “quantify” in his affidavit the degree to which the deterioration of Lennon’s condition was attributable to Dr. Johnston’s negligence. Under the circumstances, I respectfully disagree. The affidavit provides clear, unambiguous expert opinion testimony that Dr. Johnston’s negligence proximately caused a delay in diagnosis in treatment, which, in turn, proximately caused damage to Lennon. The absence of more detailed language “quantifying” the amount of damage resulting from the delay in diagnosis does not make the affidavit “speculative” as to the issue of probable cause.[17]
I recognize that Dr. Shore’s affidavit is not elaborate. “An expert witness’s opinion that is eonclusory, speculative, and without a proper evidentiary foundation cannot create a genuine issue of material fact.” Bradley v. Miller, 878 So.2d 262, 266 (Ala.2003) (citing Becton v. Rhone-Poulenc, Inc., 706 So.2d 1134, 1141-42 (Ala.1997) (emphasis added)). However, even if Dr. Shore’s testimony could be characterized as “eonclusory” merely because it is simple and direct, it is not “speculative” or “without proper evidentiary foundation” as to the issue of causation *54 upon which the trial court based its summary judgment. It is clear from Dr. Shore’s affidavit that his conclusions are based on his knowledge, experience, and training as a pediatrician, his examination of Lennon, his review of Dr. Johnston’s medical records, and his expert familiarity with the standard of care applicable to Dr. Johnston. The fact that Dr. Shore did not go into great detail in his affidavit about the reasons underlying his opinions does not mean they are “speculative.”[18]
Finally, although I do not rely for my conclusion that the summary judgment is improper on the testimony of Dr. Daniel Adler, I respectfully disagree with Justice Smith’s inference that Dr. Adler’s testimony was based solely on the general premise that “the earlier a condition is treated, the better the outcome.” Dr. Adler agreed that the premise was a “general and accepted rule in medicine,” but he did not agree that it was the sole basis of his opinion.[19] Moreover, Dr. Adler’s testimo *55 ny, speculative or not, did not form the basis of Dr. Shore’s testimony.

III. The Inapplicability of Rule 28, Ala. R.App. P.

It would be error to affirm the summary judgment on the basis of Rule 28, Ala. R.App. P. (requiring that an appellant’s brief must include “[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on”); see also Ex parte Borden, [Ms. 1050042, August 17, 2007] — So.3d —, — (Ala.2007) (“The purpose of Rule 28, Ala. R. App. P., outlining the requirements for appellate briefs, is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make.”).
Affirmance of a summary judgment for failure to cite legal authority as required by Rule 28 “ ‘has been limited to those cases where there is no argument presented in the brief and there are few, if any, citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions.’ ” Roberts v. NASCO Equip. Co., 986 So.2d 879, 382-83 (Ala.2007) (quoting Borden, — So.3d at —). This Court does not affirm a summary judgment on Rule 28 grounds where (as here), although a party’s brief does not cite an abundance of legal authority, the brief does contain sufficient citations to caselaw to adequately frame the issues, and the brief is sufficient to adequately apprise the Court of a party’s contentions with regard to an argument. 986 So.2d at 383; Borden, — So.3d at —.
The Groovers’ brief is certainly sufficient to apprise the Court of the Groovers’ argument and to allow the Court to evaluate the legal merits of the Groovers’ position. The Groovers clearly rely on the well recognized principle of law, also relied upon by the Johnston defendants, that causation is an element of a medical-malpractice action. The only issue before us is whether proof of causation exists; therefore, no further citation to legal authority is necessary. The Groovers also cite legal authority to the effect that causation is generally established by the testimony of a medical expert.
It is quite clear from the Groovers’ brief that they contend that, to satisfy the element of causation, they have submitted evidence from a medical expert to the effect that Dr. Johnston’s negligence “resulted in” the further deterioration of Lennon’s condition. I fail to see how any further citation to legal authority is necessary before this Court can evaluate (and recognize) the legal merits of this rather simple contention.
True, had the Groovers’ cited McAfee or Parker, it would have supported their arguments, but I do not think their failure to cite either McAfee or Parker negates our responsibility to analyze the merits of their position: that causation is satisfied by expert testimony that a defendant doctor’s negligence contributed to the plaintiffs damages.
In addition, the fact that McAfee and Parker were brought to our attention by the trial court’s order and by the Johnston defendants does not preclude us from con *56 sidering them, even though they support the Groovers’ position.
In support of my position regarding the inapplicability of Rule 28, I have attached a copy of the Groovers’ brief as an appendix to my dissent.

Conclusion

For the reasons stated above, I respectfully dissent from the majority’s decision to affirm summary judgment in this case.
MURDOCK, J., concurs.
*57 APPENDIX TO CHIEF JUSTICE COBB'S DISSENT
SUPREME COURT OF ALABAMA
1071143
GREG GROOVER, ET AL. APPELLANTS V. WILLIAM H. JOHNSTON, JR. , MD, ET AL. APPELLEES
APPEAL FROM JEFFERSON CIRCUIT COURT
(CV-06-1917)
BERT ALLEN
ATTORNEY FOR APPELLANTS
112 ACTON AVENUE BIRMINGHAM, ALABAMA 35209 (205) 941-0356
elbertsallenQyahoo.com
*58 TABLE OF CONTENTS
STATEMENT OP JURISDICTION xi
TABLE OF AUTHORITIES iii
STATEMENT OF THE CASE 1
STATEMENT OF THE ISSUES 3
STATEMENT OF FACTS 4
STATEMENT OF THE STANDARD OF REVIEW 10
SUMMARY OF THE ARGUMENT 15
ARGUMENT 17
CONCLUSION 31
CERTIFICATE OF SERVICE 33
*59 STATEMENT OF JURISDICTION
This Court has jurisdiction for this appeal pursuant to Ala. Code 1975, § 12-2-7. The damages sought exceed the jurisdictional amount for the Court of Civil Appeals. See Ala. Code 1975, § 12-3-10 (providing jurisdiction for civil cases' where the damages sought does not exceed $50,000).
*60 TABLE OF AUTHORITIES
Cases
Burge v. Parker, 510 So. 2d 538 (Ala. 1987) 30
Looney v. Davis, 721 So. 2d 152 (Ala. 1998) 10, 11, 21,25
Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So. 2d 1013 (Ala.2003) 21
Martin v. Dyas, 896 So. 2d 436 (Ala. 2004) 11, 14
Moore v. GAB Robins North America, Inc., 840 So. 2d 882 (Ala. 2002) 20
Tell v. Terex Corp., 962 So. 2d 174 (Ala. 2007) 23
Choice Builders, Inc. v. Complete Landscape Service, Inc., 955 So. 2d 437 (Ala. Civ. App. 2006) 21, 22
Crowe v. Interstate Safety Systems, Inc. 835 So. 2d 255 (Ala. Civ. App. 2002) 10, 25
Statutes and Court Rules
Ala. Code 1975, § 6-5-548 11, 12, 13, 14
Ala. Code 1975, § 12-2-7 i
Ala. Code 1975, § 12-3-10 i
Rule 56(c)(2), Ala. R. Civ. p. *61 19.24
Rule 56(c)(3), Ala. R. Civ. P. 10.24
Rule 56(e), Ala. R. Civ. P. 10, 24
Rule 56(f), Ala. R. Civ. P. 2,15,17,18,22, 24
Rule 702, Ala. R. Evid. 11, 14
*62 STATEMENT OF THE CASE
Greg Groover and Melinda Groover, individually and as the parents of Lennon Groover, sued William H. Johnston, Jr., MD, Birmingham Pediatric Associates, Inc., Holly Mussell, MD, Multispecialty Pediatrics, PC, Joycelyn A. Atchison, MD, and University of Alabama Health Services Foundation, PC (C.35-38) . The Groover's alleged that the defendants committed medical malpractice in the diagnosis and treatment of their son, Lennon (C.39). All the defendants filed motions to dismiss; the trial court granted them as the parent's individual claims, but denied them as to the parent's claims representing Lennon (C.250).
Dr. Atchison and the UAHSF filed a summary judgment motion in February 2007 (C.697). The trial court granted their summary judgment motion (C.760). Dr. Mussell and Multispecialty Pediatrics filed their summary judgment motion in June 2007 (C.886). The Groover's stipulated to Dr. Mussell and Multispecialty Pediatrics's dismissal in September 2007 (C.946). Dr. Johnston and BPA filed their summary judgment in July 2007 (C.933).
*63 The Groover's filed a motion.pursuant to Rule 56(f), Ala. R. Civ. P., to extend the time to conduct discovery (C,942-45). The trial court granted the Groover's until October 1, 2007, to (1) submit affidavits of expert witnesses; and (2) to submit the affidavit required by Rule 56(f) (C.). The Groover's satisfied the trial court's requests and submitted the affidavits of two experts, Dr. Shore and Dr. Adler (C.949-63). However, the trial court entered summary judgment for Dr. Johnston and BPA (C.1040-49), The Groover's appealed to this court.
*64 STATEMENT OF THE ISSUES
I. The trial court erred by entering summary judgment before the Groover's completed discovery in compliance with the trial court's scheduling order
II. The trial court erred by entering summary judgment because the Groover's presented substantial evidence for each required elements in this medical malpractice action
*65 'STATEMENT OF THE FACTS
Lennon Groover was born October 29, 1999 (C.38).
Lennon is in the 1st grade at Shades Mountain Elementary School in Hoover, Alabama (Melinda dep. 16). Melinda and Greg Groover have three children, ages 25, 15, and 7 (Melinda dep. 16-17). Melinda Groover is a lacto-ovo vegetarian, someone who eats dairy and eggs in addition to vegetables and fruits (Melinda dep. 26). She has been a vegetarian for 32 years (Melinda dep. 27). She testified that Greg, her husband and Lennon's father, is a vegetarian also (Melinda dep. 29). She prepares a vegetarian diet for her two children who live at home, but they can have meat outside the home (Melinda dep. 30-31) . Their oldest daughter who lives in Little Rock, Arkansas is also a vegetarian (Melinda dep. 31, 16). Lennon currently takes a B-12 supplement, Poly-Vi-Sol (Melinda dep. 32).
Melinda testified that she told all three doctors who treated Lennon that she was a vegetarian (Melinda dep. 36). In fact, Dr. Johnston had been her all three children's pediatrician and knew for 20 years rhat she was a vegetarian (Melinda dep. 369-70). She testified *66 that her B-12 range was in the low-normal range as tested by her obstetrician, Dr. Davidson (Melinda dep. 37). She testified that she first learned that B-12 deficiency was a risk to breast feeding vegetarian mothers from Dr. Howard (Melinda dep. 54-55). Once she was under the care of her obstetrician, Melinda Groover took folic acid and iron every day as directed by Dr. Davidson. In addition she took a Centrum multivitamin every few days (Melinda dep. 78-79) . After Lennon was born, Melinda Groover took folate and iron supplement in addition to Centrum sporadically (Melinda Dep. 81-82) .
The Groover's had no concerns about Lennon's health until he was 9 months old (Melinda dep. 197). She testified that he had trouble eating solid food and would gag on the food (Melinda dep. 196-97). Dr. Johnston advised them that they 'should wait to have Lennon's tongue clipped at 18 months to help him manipulate table food (Melinda dep. 202). She asked Dr. Johnston, Lennon's pediatrician, if she could give him formula in addition to breast feeding, and he advised her not to do so; that breast feeding provided *67 complete nutrition and to give him formula would be developmentally inappropriate (Melinda dep. 197-98). She testified that Dr. Johnston was comfortable with exclusive breast feeding until 18 months (Melinda dep. 201). She further testified that she did not originally plan to exclusively breast feed Lennon for 18 months (Melinda dep. 208). She testified' that Dr. Atchison was not concerned with the exclusive breast feeding (Melinda dep. 207). She had breast fed her two older children exclusively for 6 months and that was more in line with what she originally planned to do with Lennon (Melinda dep. 209).
Melinda Groover testified that Lennon's growth and behavior were normal after birth (Melinda dep. 381-84) . Starting at 9 months, the Groover's noticed development delays (Melinda dep. 218). Lennon did not crawl, he did not turn over (Melinda dep. 218-21). At 15 months, Melinda Groover asked Dr. Johnston about a possible B-12 deficiency, but Dr. Johnston said no that Lennon only had low iron (Melinda dep. 225, 278). Dr. Johnston told them it was normal for Lennon not to walk at 15 months (Melinda dep. 255). Melinda Groover *68 testified that she questioned Dr. Johnston 3 times about a B-12 deficiency as a problem; at the 12, 15, and 21 month check-ups — each time he rejected that as a possibility (Melinda dep. 319).
Lennon did not walk until he was 2 ⅛ with a walker Hand In Hand gave the Groover's (Melinda dep. 346). He potty trained at 4 ⅛ (Melinda dep. 346). He has a limited diet due to continued sensory issues (Melinda dep. 346). He has selective mutism (Melinda dep. 347). Lennon is in special education, cannot write well, cannot talk well, and has occupational therapy classes at school (Melinda dep. 355). Melinda testified that Dr. Bowles evaluated Lennon's IQ and it is 60, below normal range (Melinda dep. 355-56).
The Groover's took Lennon to Dr. Mussell in August 2001 (Melinda dep. 232) . Dr. Mussell was first concerned with Muscular Dystrophy, and other muscle diseases, and referred Lennon to Early Intervention (Melinda dep. 271). Lennon was weak and not talking (Melinda dep. 272). Dr. Mussell was convinced he had a muscopolysaccharide diseases and did a skin biopsy (Melinda dep. 301).
*69 The Groover's next referral was to Dr. Atchison {Melinda dep. 302). Melinda Groover obtained Lennon's medical records from Dr. Johnston in November 2001 (Melinda dep. 321-22). - After she read the records she noticed he had not had normal blood work after 12 months and she asked Dr. Mussell to test for B-12 (Melinda dep. 332). Dr. Johnston performed the blood test and informed them in December 2001 that Lennon did have a B-12 deficiency (Melinda dep. 333-36) . Dr. Mussell told the Groover's she has had other patients like Lennon and did not test these children either for B-12 deficiency, as she believed they had an unidentified syndrome (Melinda dep. 343-44).
The Groover's first attorney's referred them to Dr. Shore in Atlanta. Dr. Shore stated that Lennon's brain damage is caused by a B-12 deficiency that Dr. Johnston, Dr. Mussell, and Dr. Atchison failed to diagnosis and treat (Melinda dep. 353-356).
Dr. Mussell testified that the MRI abnormalities were caused by a B-12 deficiency (Mussell dep. 33). Dr. Mussell also admitted to not recording conversations she had with the Groover's (Mussell dep. *70 69-71). Dr. Mussell testified that nutrition issues were referred to Dr. Johnston as the pediatrician (Mussell dep. 65). Dr. Mussell testified that she recognized the potential for medical malpractice in the treatment of Lennon in, August 2002 (Mussell dep. GO-JO). Dr. Mussell testified that any board certified pediatrician, such as Dr. Johnston should be well-versed in child nutrition issues (Mussell dep. 194). Dr. Mussell was aware that Melinda Groover was a vegetarian while she was treating Lennon (Mussell dep. 205). Her referral letter to Dr. Atchison relates Melinda Groover as a vegetarian.
*71 STATEMENT OP THE STANDARD OP REVIEW
I. Summary Judgment
A summary judgment is proper only if no issue of fact exists on each of the elements of the claims asserted. Rule 56(c)(3), Ala. R. Civ. P. A summary judgment is proper only where the nonmovant fails to present substantial evidence for each element of each claim asserted. Rule 56(e), Ala. R. Civ. P. This Court reviews a summary judgment de novo, and no presumption of correctness attaches to the trial court's decision. Crowe v. Interstate Safety Systems, Inc. 835 So. 2d 255 (Ala. Civ. App. 2002). Whether to affirm or reverse a summary judgment is an issue of law. Id.
II. Medical Malpractice Elements
The well-established standard of review for medical malpractice cases is:
To prove liability in a medical malpractice case, the plaintiff must prove (1) the appropriate standard of care, (2) the doctor's deviation from that standard, and (3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff. Complete Family Care v. Sprinkle, 638 So.2d 774 (Ala.1994); Bradford v. McGee, 534 So.2d 1076 (Ala.1988); § 6-5-484, Ala.Code 1975. The plaintiff in a medical malpractice action generally must establish the prima *72 facie elements by introducing expert testimony. Bradford, supra.
Looney v. Davis, 721 So. 2d 152, 158 (Ala. 1998) .
III. Medical Malpractice Expert Witness
Ala. Code 1975, § 6-5-548, and Rule 702, Ala. R. Evid., govern the requirements for an expert witness in a medical malpractice action. See Martin v. Dyas, 896 So. 2d 436 (Ala. 2004). Section 6-5-548 states:
(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.
(b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a "similarly situated health care provider" is one who meets all of the following qualifications:
(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
*73 (2) Is trained and experienced in the same discipline or school of practice.
(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.
(c) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, and holds himself or herself out as a specialist, a "similarly situated health care provider" is one who meets all of the following requirements:
(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
(2) Is trained and experienced in the same specialty.
(3) Is certified by an appropriate American board in the same specialty.
(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard cf care occurred.
(d) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, no evidence shall be admitted or received, whether of a substantive nature or for impeachment purposes, concerning the medical liability insurance, or medical insurance carrier, or any interest in an insurer that insures medical or other professional liability, of any witness presenting testimony *74 as a "similarly situated health care provider" under the provisions of this section or of any defendant. The limits of liability insurance coverage available to a health care provider shall not be discoverable in any action for injury or damages or wrongful death, whether in contract or tort, against a health care provider for an alleged breach of the standard of care.
(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a "similarly situated health care provider" as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty.
Rule 702, Ala. R. Evid., states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
*75 The decision to admit expert testimony is within the discretion of the trial court/ however, the trial court should admit medical expert testimony that satisfies § 6-5-548 if the "proposed testimony was within the scope of [the] expertise and was clearly relevant to the issue in dispute.” Martin, 896 So. 2d at 441.
*76 SUMMARY OF THE ARGUMENT
I. The trial court erred by entering summary judgment before the Groover's completed discovery in compliance with the trial court's scheduling order
The trial court erred by entering summary judgment before the Groover's completed discovery in compliance with the trial court's order. It is undisputed that the Groover's satisfied the requirements of Rule 56(f); yet, the trial court hastily entered summary judgment for Dr. Johnston before the Groover's completed a deposition of their expert Dr. Shore. The Groover's demonstrated that Dr. Shore's evidence is crucial to their case; it establishes the Dr. Johnston's breach of the standard of care and that the breach caused Lennon's injuries. The issue of causation is not properly on appeal because Dr. Johnston untimely raised that issue in a supplemental brief that did not comply with the trial court's scheduling order.-
XI. The trial court erred by entering summary judgment because the Groover's presented substantial evidence for each required elements in this medical malpractice action
The Groover's submitted substantial evidence for each element of the medical malpractice claim. The *77 Groover's presented qualified expert testimony as to the standard of care, the breach of the standard of care, and that the breach caused injuries to Lennon.' The fact that Melinda Groover is a vegetarian does not support a conclusion that contributory negligence caused Lennon's injury; Dr. Johnston has not raised that issue in his summary judgment motion and any evidence related to her diet as a cause of Lennon's injuries is conflicting. Therefore, the trial court erred by entering summary judgment.
*78 ARGUMENT
I. The trial court erred by entering summary judgment before the Groover's completed discovery in compliance with the trial court's scheduling order
The Groover's filed this lawsuit in March 2006 (C.35). Their original attorneys withdrew from the case in June 2007 (c.928-30). In July 2007, Jonathan Gathings entered appearance as counsel for the Groover's (C.942). The trial court entered an order on July 26, 2007, that stated that Gathings filed a Rule 56(f), Ala. R. Civ. P., motion, requesting additional time to perform discovery to respond to Dr. Johnston'S summary judgment motion filed in July 2007, shortly after the Groover's original attorneys withdrew (C.933-41) .
The trial court's July 26, 2007, order provided that the Groover's have until October 1, 2007, to identify and submit affidavits of expert witnesses to support their response to Dr. Johnston's summary judgment motion. If the Groover's did not satisfy the requirements of the July 26, 2007, order, then the rrial court would take Dr. Johnston's July 2007 summary judgment motion under submission. On September 28, *79 2007, the Groover's filed a response to Dr. Johnston's summary judgment motion (C.949-63). That motion included the affidavit of Dr. Shore and the deposition of Dr. Adler..
On October 3, 2007, the trial court issued an order that stated-that the Groover's satisfied the requirements of the July 26, 2007, order (C.965-66). The trial court then entered a new schedule. The trial court set a hearing on the summary judgment motion on January 10, 2008. Dr. Johnston's deadline to file his motion was December 31, 2007 (10 days before the hearing). The Groover's deadline to file a response was January 8, 2008, two days before the hearing.
On January 10, 2008, the day of the summary judgment hearing, Dr. Johnston filed a supplemental brief in support of his motion for summary judgment (C.967), despite the fact that the trial court had given Dr. Johnston a December 31, 2007, deadline to file his summary judgment motion (C.965).
The Groover's filed a motion to strike the supplemenrai brief on January 22, 2008 (C.997). The Groover's argued in the motion to strike that rhe *80 supplemental brief was filed late (the day of the hearing, rather than the December 31, 2007, deadline), and that it raised the issue of causation for the first time. The trial court denied the motion to strike, did allow the Groover's to reply to the supplemental brief, but eventually entered summary judgment for Dr. Johnston.
The Groover's reassert on appeal that the trial court erred by accepting the late supplemental brief. Rule 56(c)(2) requires that a movant file his motion 10 days before the hearing, which is what the trial court required in this case. The trial court violated Rule 56(c)(2) and its own order by allowing the supplemental brief. The trial court's order clearly stated that "Movant shall file his motion, brief, and evidentiary submissions, or any supplementations thereto, by no later than December 31, 2007." The trial court clearly erred by allowing the supplemental brief.
Dr. Johnston's motion for summary judgment filed in July 2007, argued that the Groover's did not present substantial evidence that Dr. Johnston breached the standard of care because they had not presented that *81 evidence from an expert. The trial court July 27, 2007, order allowed the Groover's extra time to presenl expert affidavits, which they did. Both Dr. Shore's affidavit and Dr. Adler's deposition (Dr. Adler had been retained for some time before this and Dr. Shore was retained after the July 27, 2007, order).
The Groover's response addressed the standard of care issue in response to Dr. Johnston's original summary judgment motion. Dr. Johnston's original summary judgment motion did not address the issue of causation. As stated above, the trial court erred by allowing Dr. Johnston to raise this new issue on the date of the summary judgment hearing.
In Moore v. GAB Robins North America, Inc., 840 So. 2d 882 (Ala. 2002), this Court held that the trial court committed reversible error by not allowing the non-movant plaintiff an opportunity to respond to the defedant's motion for summary judgment. This Court stated that "to cut off Moore's opportunity to make a showing of disputed facts to the trial court is to prevent him from having his day in court." Id. at 884. *82 Similarly, in this case, allowing the supplemental motion prevented the Groover's from their "day in court."
The trial court should have disallowed the supplemental motion because it raised a new issue that had not been raised in the original motion - the issue of causation. The original motion argued that summary judgment should be entered-because the Groover's had not provided testimony through a qualified expert that Dr. Johnston breached the standard of care. The original motion did not argue that the summary judgment was supported by a lack of causation evidence, another element of a medical malpractice action. See Looney v. Davis, 721 So. 2d 152, 158 (Ala. 1998) .
A nonmovant has the burden to produce substantial evidence of an issue of fact as to each legal issue argued.by the movant. Rule 56. Logically then, the nonmovant has no burden to produce substantial evidence to issues not raised by the movant. See Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So. 2d 1013, 1020 (Ala.2003); and Choice Builders, Inc. v. Complete Landscape Service, *83 Inc., 955 So. 2d 437 (Ala. Civ. App. 2006). Because the supplemental motion was not properly before the trial court and therefore, the issue of causation had not been properly raised, then the Groover’s had no burden to respond to the issue of causation and the trial court erred by entering summary judgment on this issue.
Even if the issue of causation were properly before the trial court, the trial court also erred by entering summary judgment because the Groover's had not been given the opportunity to complete discovery on the issue of causation. Rule 56(f) states:
Should it appear from the affidavits of a party opposing the motion that the party cannot, for reasons stated, present by affidavit facts essential to justify the party's opposition, the court may deny the motion for summary judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
As stated above, the Groover's satisfied the
requirements of Rule 56(f) as stated in court's October 3, 2007, order (C.965). submitted the affidavit of Dr. Shore, a pediatrician (C.952-54). The Groover's the trial The Groover's board certified had already *84 completed the deposition of Dr. Adler, a board certified pediatrics, pediatric neurology, and electrodiagnostic medicine (Adler dep. 26). Before any depositions of Dr. Shore had been made, the trial court entered summary judgment. The trial court should have waited until Dr. Shore's deposition was completed before taking the summary judgment for decision. If the trial court was satisfied with the Groover's Rule 56(f) showing in October, why only 3 months later did the trial court enter summary judgment without allowing the deposition of Dr. Shore?
This Court has held that it is error for a trial court to enter summary judgment when the nonmovant files a Rule 56(f) affidavit and the evidence sought is "crucial to [the] claims and defenses." Tell v. Terex Corp., 962 So. 2d 174, 183 (Ala.2007). Clearly in this case, Dr. Shore's deposition testimony is "crucial" to the Groover's malpractice claim. As stared in Dr. Shore's affidavit, he is prepared to testify that Dr. Johnston did not meet the standard of 'care for pediatrics (C.953). He also stated that Dr. Johnston's delay in treating Lennon's B-12 deficiency *85 contributed to Lennon's injuries (C.953). Clearly, Dr. Shore's testimony was "crucial" to the Groover's case, and the trial court committed reversible error by entering summary judgment for-Dr. Johnston before allowing Dr. Shore's deposition to be completed.
II. The trial court erred by entering summary judgment because the Groover's presented substantial evidence for each required element in this medical malpractice action
Without waiving the above argument that the trial court's summary judgment violated its own order, Rule 56(c)(2) and Rule 56(f), the Groover's also argue that they presented substantial evidence on each element of the medical malpractice claims.
A summary judgment is proper only if no issue of fact exists on each of the elements of the claims asserted. Rule 56(c)(3), Ala. R. Civ. P. A summary judgment is proper only where the nonmovant fails to present substantial evidence for each element of each claim asserted. Rule 56(e), Ala. R. Civ. P. This Court revdews a summary judgment de novo, and no presumption of correctness attaches to the trial court's decision. *86 Crowe v. Interstate Safety Systems, Inc. 835 So. 2d 255 (Ala. Civ. App. 2002). Whether to affirm or reverse a summary judgment is an issue of law. Id.
To prove liability in a medical malpractice case, the plaintiff must prove (1) the appropriate standard of care, (2) the doctor's deviation from that standard, and (3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff. Complete Family Care v. Sprinkle, 638 So.2d 774 (Ala.1994); Bradford v. McGee, 534 So.2d 1076 (Ala.1988); § 6-5-484, Ala.Code 1975. The plaintiff in a medical malpractice action generally must establish the prima facie elements by introducing expert testimony. Bradford, supra.
Looney v. Davis, 721 So. 2d 152, 158 (Ala.1998).
Dr. Johnston concedes that Dr. Adler and Dr. Shore are qualified experts; therefore, their status as experts qualified to give testimony regarding the standard of care, the breach of that standard, and causation is undisputed. Dr. Johnston does assert in his motion for summary judgment that Dr. Adler and Dr. Shore's evidence is not substantial evidence of these elements. The Groover's argue that the testimony is substantial evidence, and the trial court erred by entering summary judgment for Dr. Jchr.stcn.
A. Standard of Care
*87 The Groover's presented substantial evidence, through expert testimony that Dr. Johnston breached the standard of care of a pediatrician. Dr. Shore is a. board certified pediatrician. He stated that Dr. Johnston did net comply with the standard of care in his treatment of Lennon. Dr. Shore stated that Dr. Johnston's breached the standard of care by his- delay to recognize Lennon's developmental delays and his delay to refer Lennon to appropriate specialists. Dr. Shore further stated that Dr. Johnston's actions (failure to diagnose for 6 months) caused Lennon's health to deteriorate further (C.952-53).
B. Deviation from Standard of Care
Dr. Adler, who was deposed, before the trial court improperly entered summary judgment,.testified that Dr. Mussell breached the applicable standard of care by failing to diagnose Lennon's B-12 deficiency for several months (Adler dep. 43). Dr. Adler also testified that Dr. Mussell and Dr. Johnston failed to communicate regarding Lennon's condition and their respective treatment, which also breached the standard of care (Adler dep. 43). Dr. Mussell admitted that she *88 did not read Lennon's medical records when Dr. Johnston referred Lennon to her (Mussell dep. 147). Dr. Adler pointed out than Dr. Mussell admitted in her deposition that she believed Lennon's MRI abnormalities were related to B-12 deficiency (Mussell dep. 33, Adler dep. 45) .
C. Causation
Dr. Adler testified that Lennon's B-12 deficiency most likely developed around 12 months of age (Adler dep. 64). Dr. Adler pointed out that Lennon could sit up at 9 months, but could not walk until after 19 months (Adler dep. 64). Dr. Adler explained his timeline for Lennon's B-12 deficiency as follows:
I think that this baby was born with adequate stores of B-12. He was normal at birth. All notes about him early in life -were that he was thriving and doing well. I think that his nutritional deficiencies -- and, again, speaking as a pediatric neurologist — were such that from the fact that he wasn't eating anything and he was only being breast-fed were not only vitamin B-12 deficiency, which, of course, we learned later, but much earlier we seemed to have iron deficiency that's described in the records. Iron supplementation is commenced. That's at about a year of age. So my feeling is that there was more likely than not a combination, and that the prob_ems with B-12 that ultimately produced more, you know, significant problems began really after a few *89 more months of continued vitamin B-12 deficiency.
(Adler dep. 65-66).
Dr. Adler explained the progression of Lennon's injuries from the B-12 deficiency as follows:
I think he had a degree of white matter injury based on the imaging abnormalities. That must have been at least four to six weeks old, because he's talking about a diminution in the volume of the white matter. So since B-12 is involved in myelin production, its absence leads to injury in myelin producing cells.
So first you get injury. You would see it on specific abnormalities. And then whatever those cells are, since they can't survive metabolically — since they have a metabolic injury, they can't survive. Then they shrink after a while. And that takes time to develop.
[[Image here]]
There was already a loss of volume in the brain that was caused by chronic vitamin B-12 deficiency, so that the imaging in August [2001] was abnormal. And I think even B-12 administration at that point would have still — would not have permitted this boy to be normal.
[[Image here]]
Q. He had permanent brain injuries by that point in time that were going to cause him to have developmental delays and other issues that occur from brain injury, correct?
A. True.
*90 Q. And that condition had existed, in your opinion, at least four to six weeks by the time that MRI was performed, correct?
A. Correct.
Q. Which would point the injuries to these permanent injuries to Lennon occurring by mid-July to early August, correct?
A. True.
(Adler dep. 70-71) .
When asked if any other birth defects or problems contributed to Lennon's injuries, Dr. Adler testified, "there's no other diagnosis in the records that I can see, other than 3-12 deficiency." (Adler dep. 80). Again, Dr. Adler states that Lennon's records show no other causes for his injuries other than the B-12 deficiency (Adler dep. 82-83). Dr. Adler dismissed Dr. Johnston's earlier reliance on an iron deficiency or iron anemia because the low iron would not cause the white brain matter decrease that the B-12 deficiency caused in Lennon (Adler dep. 83).
D. Evidence of Contributory Negligence
The questions Dr. Johnston posed to Melinda Groover during her deposition indicate that Dr. Johnston may argue that Melinda Groover's decision to be a vegetarian caused Lennon's injury. This argument *91 cannot support the summary judgment because the causal relationship between Melinda Groover's vegetarian diet and Lennon's injuries is disputed. As stated above, the Groover's presented evidence that Dr. Johnston had known of Melinda Groover's vegetarian diet for-the 25 years he treated her 3 children, and that Dr. Musseil and Dr. Atchison also knew of Melinda Groover's’ vegetarian diet. Furthermore, Dr. Johnston has not argued in his summary judgment motion that Melinda Groover's vegetarian diet is contributory negligence; therefore, he cannot argue that on appeal as a ground to support the summary judgment. See Burge v. Parker, 510 So. 2d 538 (Ala. 1987) (holding that contributory negligence must be raised as a defense in the trial court).
*92 CONCLUSION
The trial court erred by entering summary judgment. The trial court violated Rule 56(f) and its own scheduling order by entering summary judgment before the Groover's had completed crucial discovery to support their claim. Also, the trial court erred by allowing Dr. Johnston to file a supplemental brief after the deadline the trial court set for Dr. Johnston. The trial court further erred by allowing Dr. Johnston to raise the issue of causation for the first time in the untimely supplemental brief.
Despite the procedural errors made by the trial court, the Groover's presented substantial evidence that Dr. Johnston, Dr. Mussell, and Dr. Atchison committed malpractice. The Groover's submitted evidence from qualified medical experts as to the standard of care, the breach of the standard of care, and damages to Lennon. Therefore, the trial court erred by entering summary judgment for the Groover's and the trial court's judgment should be reversed for this case to proceed to a jury trial.
*93 Respectfully submitted,
/s/ Elbert S. Allen
*94 CERTIFICATE OF SERVICE
I hereby certify that a copy of the above brief of appellant has been served on counsel of record, by placing same in the United States mail, first-class postage prepaid, and addressed' to:
Michael Florie
Starnes and Atchison P.0. Box 598512 Birmingham, Alabama 35259-8512
/S/ Elbert S. Allen_ OF COUNSEL

. In setting forth these facts, I understand that, in reviewing a trial court’s ruling on a summary-judgment motion, “‘[t]he court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts [regarding the facts] in favor of the nonmoving party.’ ” Richardson v. Terry, 893 So.2d 277, 281 (Ala., 2004) (quoting Bruce v. Cole, 854 So.2d 47, 54 (Ala.2003)).

. The Groovers are vegetarians. Dr. Johnston, a pediatrician who practices with Birmingham Pediatric Associates, Inc., had been the Groover family pediatrician for 20 years and was very aware that the Groovers are vegetarians.

. A summary judgment had earlier been entered for the other defendants on another ground.

. I authored Crutcher, which applied McAfee to overturn a jury verdict for a plaintiff in a medical-malpractice case. In Crutcher, the plaintiff, Iola Williams, presented evidence at trial that an emergency-room doctor’s failure to treat her dangerous brain condition or to transfer her to University of Alabama at Birmingham Hospital by emergency vehicle caused a delay in treatment and a lack of emergency care when it was needed. Williams’s medical expert testified that, generally, a delay in treatment of a patient with a condition like Williams’s could cause the patient's condition to further deteriorate. Cf. McAfee (holding that evidence that “generally ... 'time is of the essence' in treatment]” or that "generally, the sooner the . treatment, the better the expected result,” 641 So.2d at 268, was not sufficient to establish causation in a particular case). However, viewing the evidence in the light most favorable to Williams, the Court found no evidence of a probability that any legally cognizable injury to Williams actually resulted from the emergency-room doctor’s alleged negligence in placing Williams at risk that an injury could occur. See Crutcher, 12 So.3d at 648. Therefore, we reversed the judgment for Williams and rendered a judgment for the emergency-room doctor. Id.

. Because causation is an essential element of a medical-malpractice action, I have not shied from upholding summary judgments in medical-malpractice cases when the plaintiff’s evidence was not sufficient to create a genuine issue of material fact as to whether a physician’s breach of the standard of care actually caused damage to the plaintiff. See, e.g., Giles v. Brookwood Health Servs., Inc., 5 So.3d 533 (Ala.2008); cf. Crutcher v. Williams, 12 So.3d 631 (Ala.2009) (relying on McAfee). However, this is not such a case.

. I respectfully disagree with Justice Smith's suggestion that causing Lennon’s condition to deteriorate further is not the same thing as causing Lennon's condition to be worse than it otherwise would have been.

. The lack of commentary in Dr. Shore’s affidavit quantifying the probable extent to which Dr. Johnston’s alleged breach of the standard of care contributed to Lennon’s brain injury over and above what he otherwise would have sustained would be relevant to the extent of Lennon’s damages attributable to Dr. Johnston, but it does not negate the existence of evidence indicating that Dr. Johnston probably caused Lennon actual damage (further deterioration of his condition) by breaching the standard of care. The lack of commentaiy as to the extent rather than the cause of Lennon’s damage is not the basis upon which the trial court entered the summary judgment now at issue.

. An absence of proof of the extent or amount of damage attributable to the delay in diagnosis and treatment does not reasonably appear to be the basis of the motion for summary judgment. That issue also was not the basis of the trial court’s ruling or the issue on appeal. Under the circumstances, it would be error to affirm the judgment on grounds that the Groovers did not submit evidence as to the quantity of their damages.
I recognize that "we will affirm a summary judgment if that judgment is proper for any reason supported by the record, even if the basis for our affirmance was not the basis of the decision below and even if the basis for our affirmance was not argued below.” DeFriece v. McCorquodale, 998 So.2d 465, 470 (Ala.2008) (emphasis added) (citing Smith v. Equifax Servs., Inc., 537 So.2d 463, 465 (Ala.1988)). However, it is never appropriate to affirm a summary judgment on an issue not argued below when (as here) affirmance would prejudicially deprive the nonmovant of notice and an opportunity to supply the record with evidence on that issue. Cf. Giles v. Brookwood Health Servs., Inc., 5 So.3d 533, 555 (Ala.2008) (discussing the limitations on a trial court’s ability to sua sponte enter a summary judgment). The motion for a summary judgment does not reasonably appear to be based on the contention that the extent of damages resulting from Dr. Johnston’s negligence was speculative. Thus, the Groovers were not reasonably placed on notice that, to overcome the summary-judgment motion, they were required to present evidence that their damages were “quantifiable.” Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038 (Ala.2004) (“Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence' as to the existence of a genuine issue of material fact.” (emphasis added)).

. I note that Dr. Johnston’s affidavit was no more detailed than is Dr. Shore’s. Dr. Johnston’s affidavit was the sole evidence presented in support of the summary-judgment motion. In his affidavit, Dr. Johnston stated his opinion as follows:
"I complied with the applicable standard of care for a board certified pediatrician with respect to all of the care and treatment I rendered to Lennon Groover at all times. Nothing done by me, or not done by me, constituted a breach of the applicable standard of care which proximately caused harm to Lennon Groover.”
If Dr. Johnston’s affidavit was sufficient to support the motion for a summary judgment, then Dr. Shore's affidavit was sufficient to overcome it. Cf. Swendsen, 530 So.2d at 769 (“[W]hile the defendants' conclusory affidavits shifted the burden of proof to the plaintiff to produce counter expert evidence, the standard by which the two sides are to be judged remains the same.... We hold, therefore, that, for summary judgment purposes, [the plaintiff's expert’s] affidavit, when judged by the same standard as that by which [the defendant physician’s] affidavit is judged, raises triable issues of fact as to both the plaintiff’s allegations of [medical] negligence and her claims of proximate cause; thus, we reverse the summary judgments appealed from and remand the cause for trial.” (emphasis added)); cf. also Giles v. Brookwood Health Servs., Inc., 5 So.3d at 549 (noting the sufficiency of a defendant physician’s affidavit similar to Dr. Johnston’s).

. The relevant portion of Dr. Adler's testimony is as follows:
"Q. Could you state with a reasonable degree of medical certainty that Lennon’s condition today would be any different if Dr. Mussell and Dr. Johnston had spoken and the diagnosis was made earlier?
"A. Well, I think he would have been treated months earlier and he would be better, but I don't think he would be normal. I think I said that earlier.
"Q. Do you agree that that opinion, that he would be better with an earlier diagnosis, knowing that it's already your opinion that he would have already had permanent neurological injuries by that time, do you agree that this opinion that you have about additional neurological — permanent neurological injury occurring after Dr. Mussell became involved requires you to speculate?
"A, I don't think it’s speculation to say that when you have an ongoing process that produces injury to the brain or leads to injury to the brain and as it continues that the injury — or the effects of that injury worsens. But I’m not able to tell you how much worse it would be, just that he would be better.
“Q. Is that just based on some general concept of the sooner you treat a condition, the better the outcome, generally?
"A. I mean, that’s a general and accepted rule in medicine.
"Q. And do you apply that to Lennon’s condition in supporting your opinion that if Lennon had been diagnosed in September or October he would be better than he is today?
"A. Yes. I mean, I think it’s a cumulative injury. I think the B-12 deficiency begins, the neurological disability begins, the neurological injury reaches the point of no return, so to speak, and it continues to increase until treatment is initiated.
“Q. You can’t say in any way how Lennon would be different today if he had been *55 diagnosed in the middle of September or early October, can you?
“A. I would say he would be better, but after that I don’t have an opinion.
"Q. You just say he would be better, but you can’t quantify that in any way, correct?
"A. Correct.”