THOMPSON, Presiding Judge.
Joey Frazier, the executor of the estate of his mother, Florine Bryant, appeals from a judgment as a matter of law entered in favor of Frank Gillis, M.D., in this medical-malpractice case.
The record, viewed in the light most favorable to Frazier, see Leonard v. Cunningham, 4 So.3d 1181, 1184 (Ala.Civ.App.2008), indicates the following:
Dr. Gillis is a family practitioner who began treating Bryant in May 1999. In 2000, Carol Davis, a certified nurse practitioner, began working with Dr. Gillis at Lister Healthcare in Florence. Dr. Gillis was Davis’s “primary supervising collaborating physician.” In that role, Dr. Gillis supervised the treatment Davis provided to patients, but, Davis testified, Dr. Gillis was not required to be physically present when she rendered that treatment. Bryant’s medical records indicate that Davis treated Bryant numerous times over the years.
On August 29, 2005, Dr. Gillis diagnosed Bryant with atrial fibrillation, a heart condition that can result in the formation of a blood clot, which, in turn, can travel to the brain and cause a stroke. To treat Bryant, Dr. Gillis placed her on Coumadin, a blood thinner that lessens the chances of the formation of a blood clot. However, blood thinners like Coumadin also pose a risk for patients. Dr. Gillis testified that he typically advises his patients that Coumadin can be “a very dangerous drug unless taken appropriately.” Coumadin is a “highly individualized” drug and the proper dosage cannot be established without carefully monitoring the patient. Dr. Gillis said that patients taking Coumadin “need[ ] to be checked frequently initially, usually every two to three days, and at most once a week until it is stabilized. After which they — that time may be extended to a month, but in no way should they be checked less than — should be checked less than once a month.” The frequent testing is intended to ensure that the patient remains within what is called the “therapeutic range.” To ensure the patients remain within that range, their International Normalized Ratio (“INR”) is monitored. Dr. Gillis testified that the therapeutic range for patients with atrial fibrillation who are being treated with Coumadin is between 2.0 and 3.0. An INR of 1.0 is considered normal.
Dr. Gillis stated that he gave Bryant the instructions regarding the dangers of Coumadin and the need for initial frequent monitoring; however, Bryant’s records do not indicate that the instructions were given to her. Dr. Gillis said his practice is to make a notation in the patient’s records regarding the instructions he provides to them, and he acknowledged that a notation regarding those instructions should be in Bryant’s record. Dr. Gillis also acknowledged that he had no independent recollection of instructing Bryant on the use of Coumadin; he based his testimony on his usual practice. Davis also testified that *445 she had no recollection of Dr. Gillis’s instructing Bryant on the use of Coumadin. She stated that she provided the instructions to Bryant, but she, too, failed to include a notation regarding the instructions in Bryant’s medical records. Like Dr. Gillis, Davis testified that a notation regarding the instructions should have been included in Bryant’s records.
When Bryant was prescribed Coumadin on August 29, 2005, she was instructed to return to the lab at Lister Healthcare on August 31 to have her INR checked and to begin the process of establishing the proper dosage of Coumadin for her to take. Bryant came to the lab as ordered. Her INR on that date was 1.9. She was ordered to take five milligrams of Coumadin every day and to return to the lab in one week, on September 7, 2005, to have her INR rechecked, pursuant to Davis’s orders. A notation in Bryant’s medical records indicates, “pt. notified, sb,” which signifies that Sherry Bates, a nurse at the lab, gave Bryant the instructions. Bates testified that the notation is not made in the records until the patient is notified of the instructions.
Bryant returned to the Lister Healthcare lab as instructed on September 7, 2005, and employees of the lab drew her blood. However, the INR test was not performed on the drawn blood. On that same day, Dr. Gillis saw Bryant for a stress test; however, he did not follow up on why the INR test had not been done. He stated that, at that time, Davis was monitoring Bryant’s Coumadin dosage. However, Dr. Gillis testified that the failure to do the INR test on the blood drawn on September 7, 2005, was an error and that the proper dosage of Coumadin for Bryant could not be determined based only on the INR test done on August 29, 2005.
Dr. Gillis testified that his office records indicate that the next INR test was performed on November 14, 2005, which, he acknowledged, was “way too long between INRs.” Bryant’s November 14, 2005, INR was 34.2. Dr. Gillis agreed that an INR of 34.2 is an extremely dangerous level for the patient. Bryant had a colonoscopy on September 13, 2005, and the physician performing that examination temporarily withheld Coumadin from Bryant to prevent possible bleeding from the colonosco-py. Dr. Gillis stated that he would expect Coumadin to be withheld before such a procedure and that the Coumadin would have to be restarted. He said that he received Bryant’s colonoscopy report on October 4, 2005. No one in Dr. Gillis’s office reviewed Bryant’s medical chart when the report was received, and, at that time, Bryant was not scheduled for another check on her INR.
On October 6, 2005, Bryant was seen by a cardiologist pursuant to a referral by Dr. Gillis. The cardiologist’s report indicated that Bryant was taking Coumadin as directed by Dr. Gillis. The report indicated that a copy was forwarded to Dr. Gillis; however, Dr. Gillis testified that he was not provided with a copy of the report and that he did not see the report until litigation in this case began.
The evidence is undisputed that Dr. Gil-lis’s office had no further contact with Bryant until November 9,-2005. According to Bates’s testimony, on that date, she received a telephone call from Bryant during which Bryant complained that she had 12 blue spots on the inside of her left thigh and three blue spots on her right shoulder. Bryant also complained of having no energy. Davis received Bryant’s message, wrote “RTO” on the message slip, and returned the slip to the nurses’ box. Davis testified that “RTO” means that the patient is to return to the office immediately. Whether Bryant was actually notified to come into the office was disputed at *446 trial. A notation, “called,” appears on the message slip. However, both Davis and Bates testified that they did not call Bryant to tell her to return to the office. Dr. Gillis testified that he did not see the November 9, 2005, telephone message from Bryant. There is no indication that Bryant returned to the office for treatment at that time. Bryant’s medical records were not reviewed on November 9, 2005. Dr. Gillis acknowledged that, if they had been reviewed, he or Davis would have seen that Bryant had not had an INR test performed since her one and only INR test check on August 31, 2005.
On November 13, 2005, Dr. Gillis went out of town. On Monday, November 14, 2005, Bryant came to Dr. Gillis’s office and Davis treated her. At that time, an INR test was performed. The results indicated that Bryant had an INR of 34.2. Davis instructed Bryant to discontinue the Coumadin and to have her INR checked on Friday, November 18, 2005. She then sent Bryant home. Davis testified that Dr. Gillis had never instructed her that if a patient’s INR was as high as Bryant’s was on that day, the patient was to go to the hospital immediately.
Bryant returned to Dr. Gillis’s office on November 15, 2005, complaining that she was still bleeding from the site where blood had been drawn for her INR test the day before. She also complained of nausea and a headache. Davis ordered another INR test, and the results were faxed to her from the hospital. The results indicated that Bryant had an INR of 44.77; however, there was a note attached to the results indicating that a “mixing study” had been done and that Bryant’s INR was actually .89.[1]
Davis took the INR report to Dr. George Evans, who was handling Dr. Gil-lis’s patients while Dr. Gillis was out of town. Dr. Evans told Davis to refer Bryant to a hematologist. Davis did as instructed, and she also told Bryant that if she had any problems she was to go to the hospital. On November 16, 2005, Bryant was brought into Shoals Hospital, and, at that time, she was nonresponsive. Diagnostic testing indicated that she had suffered a subdural hematoma, or bleeding in the brain. Efforts to save her life were unsuccessful, and Bryant died on November 17, 2005. Dr. Richard Hays, who testified on behalf of Frazier, and Dr. Gillis agreed that, had Bryant received appropriate treatment on either November 14 or November 15, she would most likely have survived.
Dr. Hays is a family practitioner who prescribes Coumadin for his patients diagnosed with atrial fibrillation, like Bryant. He testified that, because of the wide variance in effective doses of Coumadin in individuals, and because the drug is so dangerous, “it is extremely important to monitor the patient at the start so that you know that they are on the proper dose and make sure they get stabilized because they may even — it may change within the first several weeks.” Dr. Hays testified that the standard of care for monitoring a patient on Coumadin is
“that sufficient testing needs to be done to determine that the patient is on the therapeutic dose, as we mentioned, and that their dose stabilizes and maintains stable. So the standard of care does not say you have to necessarily do it on a day one versus day two or day two versus day three. It is not a function of telling exactly how to do it, but it dictates that to meet the standard of care you need to be sure that the patient is within that safety range. Part of the reason for that range is, and reported in *447 studies, to prevent the strokes, but it also is a safe enough range for people to take that they did not have other problems. It would not do us any good to prevent strokes and put people in danger so that is how that range was determined.”
Dr. Hays testified that the standard of care requires that laboratory tests be performed to assure that the patient is taking the proper dosage and that the patient’s INRs fall -within the therapeutic range. He also said that the standard of care cannot be met without physician involvement and that the standard is breached when the physician has no role in the monitoring of the patient’s INRs. He further testified as to his opinion that, for all of the people working under a physician’s supervision, “it is the physician’s responsibility to make sure that they are performing [their] functions correctly.” Dr. Hays further explained the standard of care as follows:
“[Y]ou can farm out the responsibility within your staff in many different ways and many people do, but it is all — to meet the standard of care in caring for a patient with this problem a physician has to ensure that that is being done correctly.”
In other words, Dr. Hays said, the physician has the ultimate responsibility.
Dr. Hays also testified that, although physicians are not required to use a specific method to ensure that patients on Coumadin are having INR tests performed regularly, physicians must keep track of those patients to ensure that they are actually being monitored. He stated that numerous factors can change during a person’s treatment, so the INR numbers can change “so you have to have some sort of process to keep track of people.” For example, Dr. Hays testified, a physician cannot stop at simply making an appointment for a patient each month. He opined that, if a patient on Coumadin does not come in for his or her monthly appointment, the physician’s office should follow up with that patient to stress the importance of the need for further monitoring and tell the patient that, if he or she does not come in, the treatment will be discontinued. Dr. Hays said that, in his opinion, a physician cannot turn over the responsibility of monitoring a Coumadin patient to someone in his or her office and then walk away from any further responsibility. As Dr. Hays said:
“[Everybody [working in a physician’s office] has different training, different skills, but they are still — you are the physician, you are still the doctor in practice and it is still your patient whether it is the person changing the bandage or how they draw blood or whatever function they do in your office, you are still the one that the standard [of care] requires ultimately you need to make sure that what is being done to them and for them is done appropriately and within the standard of care.”
Dr. Hays then testified that, after reviewing Bryant’s medical records, in his opinion Dr. Gillis failed to meet the standard of care in several ways. He stated that Dr. Gillis never created a plan to ensure that Bryant was placed on the correct dose of Coumadin; that Dr. Gillis never adjusted Bryant’s dosage, confirmed the correct dosage, or confirmed that her dosage was stabilized; and that there is no indication in Bryant’s medical records that it was ever explained to Bryant that Coumadin is likely a “life-time drug,” and a very serious and dangerous drug that must be monitored in a certain fashion to make sure that it stays therapeutic and does not eause any dangerous problems.
Further, when asked whether Bryant’s proper dose of Coumadin was ever deter *448 mined, Dr. Hays replied that “[t]here is not one single reading on an INR that was within the therapeutic range so I cannot tell you between August 29 when she was started and November 15 [sic] when she passed that there was ever a therapeutic dose established.” Such a failure, Dr. Hays testified, falls beneath the standard of care, and, he stated, it was Dr. Gillis’s responsibility, not Davis’s, to ensure that the therapeutic dose was established. Dr. Hays also testified that the failure to ensure that Bryant’s INRs were being tested in a timely manner was also a breach of the standard of care.
When asked about whether Dr. Gillis could have ■ properly turned over his responsibility for monitoring Bryant’s Coum-adin dosage to the physician who performed the colonoscopy, Dr. Hays said that a gastroenterologist is not the proper physician to monitor a patient’s Coumadin dosage. He also stated that the physician who handles the Coumadin before a procedure such as a colonoscopy should be the physician who reinitiates the Coumadin treatment, with input from the gastroen-terologist if necessary. Dr. Hays testified that, again, Dr. Gillis failed to meet the standard of care because there were no INR tests done on Bryant after the colo-noscopy on September 13, 2005, and no tests done on her in October 2005.
Similarly, Dr. Hays noted that, when Bryant saw the cardiologist on October 6, 2005, after being referred by Dr. Gillis, the cardiologist was concerned that her heart rate was too fast and began treating her with Digoxin. However, Dr. Hays said, Digoxin can affect the level of Coumadin in one’s blood. He stated that, anytime a patient is placed on a new medication that can change how the body deals with Coum-adin, the physician monitoring the Couma-din should recheck the patient’s INR to ensure that it has not changed. He testified: “So, to meet the standard of care you need to re-determine that they are on a stable dose and therapeutic.” Dr. Hays further testified that, even though Dr. Gil-lis claimed he did not receive the cardiologist’s report, Dr. Gillis was not relieved of his obligation to ensure that Bryant’s Coumadin dosage was proper and stabilized.
Dr. Hays also testified that Dr. Gillis breached the standard of care by not ensuring that Bryant was either seen at his office or sent to the emergency room on November 9, 2005, when she called his office to complain about the possible bruising on her thigh and shoulder and her lack of energy. When Bryant came to Dr. Gillis’s office on November 14, 2005, Dr. Hays said, Davis, as someone who deals with patients being treated with Couma-din, should have recognized that Bryant’s INR constituted an “absolute critical emergency.” He said: “[The fact that she did not respond in that fashion calls into question whether she was truly capable to be handling those patients.” Dr. Hays then testified that
“within the physician’s office you can delegate any — different responsibilities to people based on their training and their abilities, but it is still the physician’s ultimate responsibility. It is your patient. You are the one that is responsible for what everybody that treats the patient under your care does for that patient. So, this is still solely Dr. Gil-lis’s responsibility whether or not he was present or not.”
Dr. Hays also said that, given the lack of monitoring of Bryant after Dr. Gillis placed her on Coumadin, Dr. Gillis breached the standard of care required to properly supervise Davis.
Dr. Hays said that, in his opinion, to a reasonable degree of medical certainty, Dr. Gillis’s breaches of the standard of care *449 caused Bryant’s death. He testified that her death was “absolutely” avoidable and that her condition was not irreversible as late as November 14 and 15, 2005, when Bryant’s INRs were extremely high.
At the close of Frazier’s case, Dr. Gillis moved for a judgment as a matter of law on the ground that his alleged negligence was not the proximate cause of Bryant’s death. Specifically, he argued that the deficient medical treatment Bryant received at the hands of other health-care providers on November 14 and 15, 2005, was the proximate cause of her death, and that, but for that intervening cause, Bryant would have survived. The trial court agreed, saying:
“If this was a borderline [case], I would let it go to the jury. That is just because that is my philosophy. I kept expecting your expert to say that even if Dr. Evans had sent her to the hospital that because of the things that had happened before, because her level never had been stabilized that she might not have lived. Or I expected him to say that Dr. Evans might not have known to send her to the hospital because she was not his patient, and he did not know how her levels fluctuated. I expected those things and that is the only way it could have gone to the jury.
“MR. DOUGLAS [Frazier’s attorney]: May I be heard briefly?
“THE COURT: I have heard it, I have looked at it, I have mulled over it, and those things were not there. And because they were not there, as much as I hate it — I believe that Bryant should not have died, and I think that is a crying shame, and my sympathy is completely and totally with Mr. Frazier. My heart breaks for him. I am so sorry for his loss. I have- lost both of my parents and if I thought their deaths should have been prevented, I don’t know how you live with it, but she should not have died, but it was not Dr. Gillis’s fault. You could not prove — did not prove your case so I am going to enter a judgment as a matter of law in favor of Dr. Gillis.
“MR. DOUGLAS: May I be heard, Your Honor?
“THE COURT: That is it, no.”
On October 21, 2010, the trial court entered a written judgment in favor of Dr. Gillis. Frazier appealed to the Alabama Supreme Court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
Frazier contends that the trial court erred in granting Dr. Gillis’s motion for a judgment as a matter of law. As an initial matter, we note that Dr. Gillis contends that Frazier waived his right to challenge the trial court’s judgment because, he says, Frazier failed to preserve the issue he raises on appeal. Specifically, Dr. Gillis contends that, in opposing Dr. Gillis’s motion for a judgment as a matter of law, Frazier failed to argue that negligent subsequent medical care is foreseeable and, therefore, that he cannot now raise that argument on appeal.
We disagree with Dr. Gillis’s assertion. This court “will not place a trial court ‘ “in error on matters which the record reveals it neither ruled upon nor was presented the opportunity to rule upon.” ’ J.K. v. Lee County Dep’t of Human Res., 668 So.2d 813, 817 (Ala.Civ.App.1995) (quoting Wilson v. State Dep’t of Human Res., 527 So.2d 1322, 1324 (Ala.Civ.App.1988)) (emphasis added).” Hamm v. Norfolk S. Ry. Co., 52 So.3d 484, 491 (Ala.2010). However, in asserting that he was entitled to a judgment as a matter of law, Dr. Gillis argued that the alleged deficient medical care Bryant received from other healthcare providers on November 14 and 15, 2005, was an intervening cause that ab *450 solved Dr. Gillis of any liability. The trial court agreed with him and entered the judgment on the ground argued by Dr. Gillis. Because the trial court considered and ruled upon the very issue now before us, this court will review the propriety of that ruling and the subsequent entry of a judgment based on that ruling.
Our standard of review of a trial court’s entry of a judgment as a matter of law is well settled.
“In Delchamps, Inc. v. Bryant, 738 So.2d 824 (Ala.1999), our supreme court explained the standard of review applicable to a trial court’s ruling on a motion for a judgment as a matter of law:
“ ‘When reviewing a ruling on a motion for a [judgment as a matter of law (“JML”) ], this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present “substantial evidence” in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).’
“738 So.2d at 830-31.”
Leonard v. Cunningham, 4 So.3d at 1184.
Frazier asserts that he presented substantial evidence of each of the elements required to sustain a claim of medical malpractice against Dr. Gillis pursuant to the Alabama Medical Liability Act (“the AMLA”), § 6-5-480 et seq. and § 6-5-540 et seq., Ala.Code 1975.
Medical-malpractice actions are generally governed by the AMLA. See Mock v. Allen, 783 So.2d 828, 832 (Ala.2000) (noting that the AMLA “applies ‘[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care.’ ” (quoting § 6-5-548(a), Ala.Code 1975)).
‘“To prevail on a medical-malpractice claim, a plaintiff must prove “ ‘1) the appropriate standard of care, 2) the [health-care provider’s] deviation from that standard, and 3) a proximate causal connection between the [health-care provider’s] act or omission constituting the breach and the injury sustained by the plaintiff.’ ” ’ Giles v. Brookwood Health Servs., Inc., 5 So.3d 533, 549 (Ala.2008) (quoting Pruitt v. Zeiger, 590 So.2d 236, 238 (Ala.1991), quoting in turn Bradford v. McGee, 534 So.2d 1076, 1079 (Ala.1988)).”
Mosley v. Brookwood Health Servs., Inc., 24 So.3d 430, 433 (Ala.2009).
In moving for a judgment as a matter of law at the close of Frazier’s case, Dr. Gillis *451 did not assert that Frazier had failed to present substantial evidence of the appropriate standards of care or evidence that Dr. Gillis had breached those standards of care. At the close of Frazier’s case-in-chief, Dr. Gillis asked the court to determine whether, as a matter of law, the subsequent intervening alleged negligence of Dr. Evans and Davis in failing to have Bryant admitted to the hospital on November 14 or 15, 2005, when her INR was dangerously elevated, relieved Dr. Gillis of any liability for her death. If it did, Dr. Gillis argued, there was no question of fact for the jury to decide, and he was entitled to a judgment as a matter of law. The trial court agreed with Dr. Gillis, and it entered the judgment accordingly.
On appeal, the issue this court is called upon to determine is whether, at this stage in the litigation, the trial court erred in finding that, as a matter of law, the alleged intervening negligence absolved Dr. Gillis of liability. In asserting that the trial court erred in entering the judgment, Frazier relies on Looney v. Davis, 721 So.2d 152 (Ala.1998). In that case, Dr. Looney was a dentist who extracted a tooth of his patient, Eva Winn Davis (“Eva”). Afterwards, Eva continued to bleed from the site and sought treatment at two hospitals in the days after the extraction. Looney, 721 So.2d at 154-55. Health-care providers in the emergency rooms at both hospitals advised Eva to apply pressure to the extraction site and to visit her dentist; they then released her. Id. On the fourth day after the extraction, Eva was again taken to a hospital emergency room. The doctor on call recognized that Eva was in critical condition and ordered a transfusion. Eva was then transported to a larger hospital, where she was diagnosed with coagulopathy, an inability of her blood to clot, because of sepsis, liver disease, and anemia. Id. at 156. Eva did not respond to treatment and died that night. Id.
Eva’s husband, on behalf of Eva’s estate, sued Dr. Looney and the hospitals who had provided care to her after the extraction, alleging that each had provided substandard medical care to Eva and that their combined and concurring negligence had resulted in Eva’s death. Id. Several of the named defendants reached settlement agreements with Eva’s estate or were dismissed from the action. Three defendants, including Dr. Looney, went to trial. A jury returned a verdict against all three in the amount of $8 million. Two of the defendants reached pro tanto settlement agreements with Eva’s estate. Dr. Looney appealed, arguing, among other things, that the trial court had erred in denying his motion for a judgment notwithstanding the verdict[2] because, he said, there was no evidence indicating that his alleged negligence had been the proximate cause of Eva’s death. Id. at 158. Instead, he argued, the negligent care provided by her subsequent health-care providers was a superseding intervening cause of her death. He also argued that proximate cause could not be established in his case because, he said, it was “simply unforeseeable that [Eva] would die as the result of an improper tooth extraction.” Id. at 159.
In rejecting Dr. Looney’s assertions, our supreme court stated that “a particular defendant’s negligence need not be the sole cause of injury in order for an action to he against the defendant; it is sufficient that the negligence concurred with the other causes to produce injury.” Id. at 158. The court went on to explain:
*452 ‘“In Alabama, the issue of proximate causation hinges on foreseeability and is intertwined, analytically, with the concept of intervening cause.’ Springer v. Jefferson County, 595 So.2d 1381, 1384 (Ala.1992). Indeed, this Court has stated:
‘“[Fjoreseeability is the cornerstone of proximate cause, Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). As a result, one is held legally responsible for all consequences which a prudent and experienced person, fully acquainted with all the circumstances, at the time of his negligent act, would have thought reasonably possible to follow that act, Prescott v. Martin, 331 So.2d 240 (Ala.1976), including the negligence of others, Williams v. Woodman, 424 So.2d 611 (Ala.1982).’
“General Motors Corp. v. Edwards, 482 So.2d 1176, 1194 (Ala.1985). This Court has further explained,
“ ‘It is an accepted principle that a defendant is liable for all the foreseeable injuries caused by his negligence. Williams [v. Woodman, 424 So.2d 611 (Ala.1982) ]; McClendon v. City of Boaz, 395 So.2d 21 (Ala.1981); O’Quinn v. Alston, 213 Ala. 346, 104 So. 653 (1925). That an injured party will receive negligent medical care is always foreseeable. This Court has accepted this presumption, holding:
“ ‘ “[WJhere one is injured by the negligent or wrongful act of another, and uses ordinary care in endeavoring to be healed, and in the selection of medical and surgical help, but his injury is aggravated by the negligence or unskillfulness of the latter, the party causing the original injury will be responsible for the resulting damages to its full extent.”
“ ‘Williams v. Woodman, supra, at 613, citing O’Quinn v. Alston, supra.’
“Ex parte Rudolph, 515 So.2d 704, 707-08 (Ala.1987) (emphasis on ‘all’ in original).”
Looney, 721 So.2d at 159 (some emphasis added).
Based on the holding in Looney, even if Dr. Evans and Davis acted negligently in their treatment of Bryant on November 14 and 15, their negligence would not relieve Dr. Gillis of responsibility for Bryant’s death if a jury were to find that he acted negligently in treating Bryant and that that negligence caused her to have a dangerously elevated INR in the first place.
In attempting to distinguish Looney from the present case, Dr. Gillis argues that the negligent care rendered by Dr. Evans and Davis was so egregious that it was unforeseeable. However, our research has revealed no Alabama authority for the proposition that there are different degrees of negligent medical care so as to make some negligent care foreseeable and other negligent care unforeseeable. Our supreme court stated in Looney, supra, that the possibility that “an injured party will receive negligent medical care is always foreseeable.” In reaching that conclusion, the supreme court did not indicate that the extent of the intervening medical negligence is a consideration. It stated:
“ ““ “As regards proximate cause ... it is not necessary to a defendant’s liability, after his negligence has been established, to show, in addition thereto, that the particular consequences of his negligence could have been foreseen by him; it is sufficient that the injuries are the natural, although not the necessary and inevitable, result of the negligent fault — such injuries as are likely, in ordinary circumstances, to ensue from the act or omission in *453 question.” 38 AmJur., § 62, p. 714.’ ” ’
“Lawson v. General Tel. Co. of Alabama, 289 Ala. 283, 289, 267 So.2d 132, 138 (1972), quoting Sullivan v. Alabama Power Co., 246 Ala. 262, 268, 20 So.2d 224, 228 (1944). It has also been similarly said that ‘it is not necessary that every detail of damage which is the ordinary and natural result [of one’s negligence] be contemplated.’ Sloss-Sheffield Steel & Iron Co. v. Wilkes, 236 Ala. 173, 178, 181 So. 276, 279 (1938).
“Thus, generally a defendant may be found liable if some physical injury of the general type the plaintiff sustained was a foreseeable consequence of the defendant’s negligent conduct, even though the extent of the physical injuries may have been quite unforeseeable. Indeed, it has been noted, ‘There is almost universal agreement upon liability beyond the risk, for quite unforeseeable consequences, when they follow an impact upon the person of the plaintiff.’ W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 43, at 291 (5th ed.1984) (footnote omitted). See also 65 C.J.S. Negligence § 109 (1966). For example, in Armstrong v. Montgomery Street Ry. Co., 123 Ala. 233, 26 So. 349 (1899), the Court held that negligence that caused an injury to one’s finger, which injury produced blood poisoning that caused death, was the proximate cause of the death:
“ ‘The fall produced the injuries; the injuries produced blood poisoning, and the blood poisoning produced death. There was no break in the chain of causation from the alleged negligent act to the death of [the] intestate. The blood poisoning was not an independent cause. It was not a superseding cause. It was itself a result, or, perhaps more accurately, a mere development of the injuries. It is not an important consideration, even if it be a fact, that blood poisoning is not a usual and ordinary result or ‘development of wounds of the character inflicted upon the intestate.’
“Id., at 249, 26 So. at 353.”
Looney, 721 So.2d at 162.
Here, if a jury finds that Dr. Gillis was negligent in his treatment of Bryant, causing her INR to become dangerously elevated, then it can also find that his negligence began the chain of events that ultimately resulted in Bryant’s death. As a matter of law, the alleged superseding intervening negligence of Dr. Evans and Davis does not absolve Dr. Gillis of liability if the jury finds that he, too, was negligent in treating Bryant and that his negligence created the condition that put her health at such extreme risk.
For the reasons set forth above, we conclude that the trial court erred in entering a judgment as a matter of law in favor of Dr. Gillis based on its determination that the superseding intervening negligence of Dr. Evans and Davis in treating Bryant absolved Dr. Gillis of liability. In reaching this holding, we express no opinion as to whether Dr. Gillis was in fact negligent in the care he rendered to Bryant. Accordingly, we reverse the judgment of the trial court, and we remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.

. There is nothing in the record that elaborates on the term "mixing study.”

. A motion for a judgment notwithstanding the verdict is now known as a motion for a judgment as a matter of law. See Rule 50, Ala. R. Civ. P., and Robertson v. Gaddy Elec. & Plumbing, LLC, 53 So.3d 75, 79 (Ala.2010).